15 N.J. Super. 499 (1951)
83 A.2d 725
DORIS H. MOORE, PLAINTIFF-RESPONDENT,
v.
PUBLIC SERVICE COORDINATED TRANSPORT, DEFENDANT-APPELLANT, AND ELLMAS BUS CO., A NEW JERSEY CORPORATION, AND NORBERT GEISSLER, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1951.
Decided October 11, 1951.
*503 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Edward V. Ryan argued the cause for respondent (Mr. George D. McLaughlin, attorney; Mr. Ryan on the brief).
Mr. Luke A. Kiernan, Jr., argued the cause for appellant (Mr. Carl T. Freggens, attorney; Mr. Kiernan on the brief).
*504 The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
This appeal by defendant Public Service Coordinated Transport is addressed only to the alleged excessiveness of a verdict in the amount of $63,300 rendered for plaintiff by the jury at the trial of this action in Essex County Court. The trial court refused upon defendant's motion to set aside the verdict.
Damages chargeable to a wrongdoer are limited to those injuries and losses which are shown to be the natural and proximate effects of his wrongful act. Wiley v. West Jersey R.R. Co., 44 N.J.L. 247 (Sup. Ct. 1882); Smith v. Public Service Corporation, 78 N.J.L. 478 (E. & A. 1910); Schlenger v. Weinberg, 107 N.J.L. 130 (E. & A. 1930); Woschenko v. C. Schmidt & Sons, 2 N.J. 269 (1949).
Ordinarily, however, the determination of those injurious results which are natural and proximate, as distinguished from those unrelated and remote, is exclusively the function of the jury. Too, having identified from the believable evidence such natural and proximate consequences, the admeasurement of the amount of pecuniary compensation is, within reasonable limits and instructions, assigned to the judgment and sound discretion of the jury. Unless there are applicable statutory standards, the law does not assume that a particular bodily injury calls for a definite amount of compensation. Here again the amount to be awarded is therefore primarily for the jury to estimate in view of the facts and circumstances of each particular case. 15 Am. Jur. Damages, p. 479, sec. 71; p. 624, sec. 207.
When on appeal we are asked to nullify a verdict as excessive after denial of that relief by the trial court, we are guided by the criterion that, giving due regard to the action of the trial court and its opportunity and that of the jury to pass upon the credibility of the witnesses, the judgment will not be disturbed unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion. Rule 1:2-20, as amended; Rule 4:2-6; Hodes v. Dunsky, 15 N.J. Super. 27 (App. Div. 1951). The *505 mere fact that the award of damages may seem to the court to be somewhat immoderate and excessive, while a circumstance to be considered, does not conclusively indicate that the verdict was the product of mistake, partiality, prejudice or passion. Gee v. Moss, 108 N.J.L. 160 (E. & A. 1931); Bowen v. Healy's, Inc., 16 N.J. Misc. 113 (Cir. Ct. 1938). "The appellate tribunal cannot invade the constitutional office of the jury; it may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury." Hager v. Weber, 7 N.J. 201, 210 (1951). We, like the trial court, may upset the judgment only when "we find the verdict so excessive as irresistibly to give rise to the inference of mistake, passion, prejudice or partiality, and by that standard to be palpably against the weight of the evidence," Ibid, 213, and should interfere with the verdict on the mere ground of excessive damages with reluctance, and never except in a clear case. Salvato v. New Jersey Asphalt & Paving Co., 135 N.J.L. 185 (E. & A. 1947).
The following quotation from the opinion in the early case of Somerville and Easton Railroad Co. ads. Doughty, 22 N.J.L. 495, 497 (Sup. Ct. 1850) continues to be pertinent:
"There is no evidence of any misbehavior on the part of the jury, or that they did not attentively listen to the testimony of witnesses and the arguments of counsel during a protracted trial; nor is there any proof of bias, or passion, or prejudice, in their minds, unless it is found in their verdict. This court has the power to set aside this verdict; but we will not exercise that power, unless we are clearly satisfied that it is wrong, exorbitant, and oppressive, and so much so as to strike the mind of every reasonable man, at once, that the jury, from some cause, have done the defendants gross injustice. We cannot exercise this power rudely because we may think the verdict too high; we cannot convert ourselves into a tribunal of fact; the law has not invested us with that power, * * *."
We allude to these elementary observations only to re-emphasize that the power of the court to set aside a verdict is essentially remedial in character and the permissible purpose *506 of its exercise is not to substitute our judgment for that of the jury and thus to supplant its appropriate function.
Plaintiff on May 2, 1949, was a passenger, seated facing forward, in a bus of Ellmas Bus Co., which, while stopped discharging passengers near the Pennsylvania Railroad station in Newark, was struck from the rear by a bus of defendant. The impact caused plaintiff first to be "pitched forward" and then to be "banged back" against the seat. The motion, "a whip lash snapping," produced a compression fracture and dislocation of plaintiff's third cervical vertebra. The orthopedic surgeon, Dr. Flanagan, a specialist in this branch of medicine since 1934, described the seriousness of the condition as "extremely rare," "I believe, including all the serious neck injuries that I have treated during the war, I have seen two about as serious as this," "If it had gone a little further she would have died in the bus; she would have been totally paralyzed and died immediately."
The seriousness of the injury was suspected by her family physician when he first saw her at home on the day of the accident. He had her removed to Presbyterian Hospital in Newark where, upon consultation with an assistant orthopedic surgeon there, traction was applied to her neck by means of a weighted canvas halter so the "neck was pulled with sandbags"; she had intense pain and also a numbness in the fingers of both hands which indicated "that there was pressure on the spinal cord at the site of the injury." When Dr. Flanagan was retained in the evening of May 5 he determined that the head halter type of traction was inadequate and that a "skeletal" traction should be applied. This entailed an operation that night in which a small hole was drilled in each side of the skull into which tongs, like "ice tongs," were inserted from which, as she lay in bed, were suspended approximately 35 to 40 pounds of weights by means of a rope which extended from her head through the top end of the bed and through a pulley. This was done in an effort to relieve the pressure on the spinal cord and to reduce the injury. Dr. Flanagan testified that there was *507 pain and "a lot of discomfort" connected with the skeletal traction, aggravated in her case when she developed an infection when one "tong slipped out of the skull and was extremely painful  just pulled directly on the scalp itself  but we were able to replace it."
Plaintiff continued in this condition for more than a month. Some motor paralysis of her upper extremities which had been present cleared up entirely, but a sensory partial paralysis of her hands, particularly the right one ("tingling and sensation as though you have had the sensation of your leg go to sleep  that pins and needles"), while improved, never cleared up and remains a permanent result of her injury.
The crushed vertebra did not improve with the traction, "it was so badly crushed that it could not be opened up." Dr. Flanagan concluded that the dislocated and fractured portion of the spine had to be fused. "If the traction is released and she was allowed up in a brace with a crushed vertebra without any stability, there was great danger of complete paralysis and the complete paralysis of the third vertebra would mean death."
On June 11, 1949, while the tongs were left in place in the skull (indeed they were not removed until July), Dr. Flanagan performed a bone grafting operation to effect the weld. The required bone was taken from plaintiff's right hip and transferred to her neck. In that manner the second to fourth vertebrae were fused. Dr. Flanagan testified that "in so doing we realized that we were going to eliminate a great range of motion of the neck."
The suffering accompanying the operations and her injury was aggravated by a painful bowel impaction which continued from the time of the accident until the middle of July.
Plaintiff remained in the skeletal traction after the bone graft a matter of three or four weeks until the tongs were replaced with a cast which covered her whole trunk, her neck and head "to keep the spine immobilized until the spine fusion took"  "it took these bone grafts approximately six months to become solid." Plaintiff was discharged from the *508 hospital on August 1, 1949. The cast remained on until October 13, 1949, when it was replaced with a metal and leather brace which plaintiff wore for several months "constantly, night and day," until gradually "it was left off for longer and longer periods."
In September, 1950, plaintiff was required to undergo a further operation. The scar at the site of the incision made in her hip for the bone graft had become so tender that even clothing against it caused her great pain. Dr. Flanagan testified that in making the incision to cut the bone piece nerve ends had been cut and there had formed "a neuroma, which is a very fine tumor at the end of the nerve." To relieve her condition, "The scar was excised  the entire scar of the union, from the skin surface through the muscles, right down to the bone  and the whole scar which was approximately six to eight inches long and half an inch wide was excised, dissected and removed and then the union again carefully closed in layers."
Plaintiff's weight fell from 135 to 62 pounds over the 18-months period. At the time of the trial she was unable to sit back in a chair because of the pain she experiences along her spine when she does so. She cannot lie flat in bed but requires support beneath her shoulders. When she slips down during sleep she suffers particularly painful tingling and a numbness in her hands where the sensory partial paralysis is centered. She frequently drops things she is holding in her right hand when her fingers relax involuntarily. She has severe and disabling headaches as often as two or three times a week; they last several hours or all day and cause her nausea. She is frequently attended by her family physician and Dr. Flanagan believes he too will have to see her "every two or three months probably and as long as she suffers and I imagine that will be  that her disability is permanent."
She has resumed some social activities, visiting friends and going to the movies. About six months before the trial she started to assist her sister in a launderette operated by her *509 sister and established before the accident with some financial help from plaintiff. She described her work as marking clothes brought in for washing, handing out tickets, soaping machines and folding clothes but said "I work for a while and then I am tired" and needed frequent rest.
Plaintiff was 40 years of age at the time of the accident, and unmarried. She had worked for some 21 years, originally as a statistician with an insurance company, then as a bookkeeper for a printing concern for a year or so, and during the seven years prior to the accident as a statistical research analyst for the American Red Cross at its New York City office. Her gross salary at the time of the mishap was $222 per month. She had known for some time, however, that her employment with the Red Cross would terminate, as it did in June following the accident. The New York office was discontinued and the activities were transferred to an office in Virginia.
An actuarian testified on plaintiff's behalf that her life expectancy at the time of the trial was 30.97 years according to the 1940 United States Life Tables, and that for that period a capital sum of $54,052 was required to produce, at a three per cent interest rate, an annual income of $2,664, that is $222 per month. Defendant surmises that the jury reached its verdict of $63,300 by adding to such capital sum the sum of $5,180 to represent earnings at $222 per month lost between the date of the accident and the date of the trial, and the sum of $4,129.05 which plaintiff proved was the total of her out-of-pocket expenses for hospital and doctors' bills, nurses and a small amount for lost clothing. The three sums total $63,361.05.
Upon the premise that this was the calculation made by the jury, defendant argues the verdict must be declared excessive because it is said the jury could not consider her monthly salary of $222 as a base to determine the amount of wages plaintiff had lost before the trial or would lose thereafter in view of the fact that her employment had terminated a month after the accident and for reasons unconnected therewith. *510 Defendant argues further that in any event the presumed loss of all wages for the period of her life expectancy was a fallacious premise because it had not been demonstrated that plaintiff was totally disabled.
The argument has no merit for several reasons. First of all, the surmise as to the method employed by the jury in arriving at the verdict is that and nothing more. The coincidence that the three sums nearly aggregate the amount of the award patently does not prove that this is what was done and, even more clearly, does not prove any misbehavior on the part of the jury. It taxes credulity to suppose that the jury considered only plaintiff's pecuniary losses and included nothing in the award for the pain and suffering so vividly portrayed in this record. The presumption is that the verdict was obedient to the court's charge, which was to make a lump sum award including sums for what the jury found plaintiff had "reasonably expended and will reasonably have to expend in all probability in the future in endeavoring to effect a cure or to alleviate the injuries and pain which proximately resulted" from the wrong, "for such wages as she probably lost from the time of the accident up to the time of this trial," "for such wages as you find from the testimony and from your own experience she will probably lose in the future as the proximate result of this accident and injury, less such earnings as you may find in a similar manner that she will probably have in her present and future condition," "for her injury and for the extent and duration of it, and for the pain and suffering which she has endured and will endure in all probability in the future as a result of this accident. There is no rule that can be laid down to you by me or anyone else by which you can fix the compensation for pain and suffering at so much per day or per week." No objections were made to the charge. It correctly instructed the jury as to the elements to be weighed and evaluated by it. It is axiomatic that the admeasurement of compensatory damages in actions for the injurious consequences of personal torts is *511 not gauged by any established graduated scale. Dandrea v. Centofante, 13 N.J. Super. 445, 447 (App. Div. 1951).
Secondly, defendant's argument erroneously assumes that plaintiff's earning capacity after the date of the accident could not be gauged upon a consideration of the salary she received from American Red Cross in view of the termination of that position so shortly after the mishap. That salary was evidence of the measure of plaintiff's earning capacity and could be properly taken into account in determining the compensation to which plaintiff was entitled for the disability which effected the diminution of her earning capacity. Miller v. Delaware River Transportation Co., 85 N.J.L. 700 (E. & A. 1914).
Finally, the record completely refutes defendant's assumption that plaintiff was only partially disabled. True, Dr. Flanagan estimated that the loss of motion in her neck was between 50 and 66 2/3 per cent. But he said, "The loss of function of the motion of the cervical spine is an extremely great disability" and expressed the opinion that so far as her previous employment was concerned, "I don't think she will ever be able to do that type of work again," that it is a painful disability, "to turn she has to turn her body and she cannot look down as quickly or as effectively as you or I do." This testimony would fully justify the jury in concluding that plaintiff was virtually totally disabled by her injury notwithstanding she can assist her sister with light chores about the launderette.
Upon this record of substantial expense and marked diminution of earning power and a particularly distressing picture of misery and pain  an extraordinary injury incurable in itself (X-rays taken about a week before the trial showed that "the fractured vertebra is still collapsed," "without the fusion she could not be up and around"), the everpresent danger for a year and a half until the fusion was complete that through some slip the instability of her neck might cause a worsening of the crushed vertebra and bring on complete paralysis and death, the bone graft and the suffering *512 which was a concomitant of the incision in her hip, the bone graft itself, a means, not to cure or repair the vertebra, for that was incurable, but to immobilize her neck to remove the threat of paralysis and death, and, the end result, still a young woman, once with "one of the nicest dispositions in the world" now "nervous, tired and very irritable," condemned to the life of the conspicuously afflicted, her rigid neck structure substantially incapacitating her for her usual employment and normal living, her lot one of continuing discomfort and misery from an enforced unnatural posture aggravated by the sensory partial paralysis of her hand and the recurring headaches  none can gainsay but that there was evidence in abundance to support a very substantial award. Then, too, this court, in Nusser v. United Parcel Service of N.Y., Inc., 3 N.J. Super. 64, 69 (App. Div. 1949) remarked:
"in addition, it may well be that the jury considered the deflated value of the dollar. Judicial notice thereof may be properly taken and the jury, in the exercise of its judgment, could have properly considered it in assessing the damages against defendant. In these days of the high cost of living and consequent decrease in the purchasing power of the dollar, one cannot well overlook or ignore the effect of such economic conditions when called upon to determine, as the jury did here, the amount of damages that would fairly and reasonably compensate one for his pain and suffering and disability proximately caused by another's negligence."
See also Bowes v. Public Service Ry. Co., 94 N.J.L. 378 (Sup. Ct. 1920), and McStay v. Przychocki, 7 N.J. 456, 463 (1951).
We do not think this case lends itself to a comparison with others in determining whether this verdict is excessive. No case of personal injuries is ever an exact and binding precedent for another upon the question of excessiveness of a verdict even where there is a close parallelism of facts and circumstances bearing upon the amount of damages. Dr. Flanagan made it clear that this plaintiff's injury and experience has few counterparts. Moreover, we have had the benefit of the trial court's appraisal that the verdict was not *513 exorbitant. We are not controlled by its determination, but we are duty bound to give it due weight when arriving at our independent conclusion from our own examination of the record. Murphy v. Terzako, 14 N.J. Super. 254 (App. Div. 1951). We cannot say in light of the rules governing the nature and extent of our review that this verdict, in the circumstances, though large, "irresistibly gives rise to the inference" that it was the product of mistake, partiality, prejudice or passion on the part of the jury.
Affirmed.