24 N.J. Super. 399 (1953)
94 A.2d 504
SIGMUND J. LUKASIEWICZ, PLAINTIFF-RESPONDENT,
v.
JAMES H. HADDAD, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1953.
Decided January 30, 1953.
*400 Before Judges EASTWOOD, BIGELOW and JAYNE.
Mr. Grover C. Richman argued the cause for appellant.
Mr. Horace G. Brown argued the cause for respondent.
The opinion of the court was delivered by JAYNE, J.A.D.
The plaintiff has a judgment against the defendant entered in accordance with the verdict of the jury awarding him the sum of $100,000 compensatory damages *401 for the bodily injuries and incidental losses he sustained in consequence of the occurrence of an automobile mishap on August 29, 1951 in Woodbury, Gloucester County. The plaintiff occupied the status of an invited passenger in an automobile owned and being operated by the defendant in a southerly direction on Salem Avenue or Salem Pike, near its intersection with Lincoln Street, where the vehicle proceeded off the westerly side of the highway and collided with a tree.
It can be immediately announced that in the existing state of the evidence we are of the opinion that the legal responsibility of the defendant for the occurrence of the collision was justifiably submitted to the jury for determination.
The predominant questions addressed to us for decision are: (a) is the award of damages so excessive as to manifestly indicate the dominant influences of mistake, partiality, prejudice or passion; (b) did the insinuations incorporated in the summation of counsel for the plaintiff improperly impart to the jury inadmissible and prejudicial information concerning the amount of the defendant's insurance coverage; and (c) did the trial judge commit error in his comment upon certain evidence during the course of his charge to the jury? The trial judge in response to an application for a new trial resolved those questions in the negative.
The testimony which the jury heard and presumably weighed and considered revealed that the plaintiff is a relatively young man, 37 years of age at the time of the trial. He has always been ambitious. The aspiration of his youth was to become a chemist. By means of his own exertions as an usher-manager in a theater and as a metallurgical observer in a steel mill he financed his education at the University of Pittsburgh, from which he graduated with a degree of Bachelor of Science in 1943. He forthwith accepted a position as a technician at the research laboratory of the Socony Vacuum Company at Paulsboro, New Jersey, where his sincerity, energy, and research capabilities soon became *402 noticeable. Indeed, he became the designated participating inventor in ten patents.
Not yet married, he resided with other matrimonially unattached employees of the laboratory in a house cooperatively maintained by them in Woodbury. Among the occupants was his friend, perhaps roommate, the defendant Haddad, who with one other alternatively each week transported the plaintiff and others to and from the laboratory, for which service the passengers made modest pecuniary contributions toward the expense entailed. Such was the occasion for the presence of the plaintiff in the defendant's vehicle on the morning of August 29, 1951.
The misfortune had grave consequences. Haddad suffered a fractured leg and other injuries. No one doubts the severity of the injuries sustained by the plaintiff. In this particular we note that although the plaintiff had been examined prior to the trial by two physicians selected by the defendant, neither was called to testify.
The trial judge instructed the jurors that if they resolved that the plaintiff was, under the rules of law which he expressed, entitled to recover, they should in estimating the award of damages consider the following elements:
"1. The physical injury sustained, and the pain and suffering incidental thereto in accordance with the nature and extent and duration of those injuries.
2. The effect on the health of the plaintiff.
3. The effect on the ability of the plaintiff to engage in active pursuits and occupations that the ordinary individuals in the circumstance of the plaintiff could and would normally engage in.
4. The loss reasonably incurred and to be reasonably incurred in the future because of the effect upon the ability of such plaintiff to undertake and pursue a gainful vocation of employment.
5. The losses reasonably incurred and to be reasonably incurred in the future for medical and hospital care and attention in an effort to cure or alleviate the injuries sustained in the accident in question."
Was the award of damages manifestly exorbitant? Brief references to the evidence will disclose the nature of the bodily injuries, their incapacitating effects, and the prognosis. The plaintiff was taken in an unconscious condition from the *403 scene of the mishap to the Underwood Hospital at about 8:15 A.M. His condition was regarded as critical. The objective and visible injuries were lacerations of the head and face. The tongue was almost completely severed. Three upper teeth had been propelled from their sockets. The lower lip was pierced through. The left ankle was dislocated.
The state of unconsciousness continued until September 1, at which time the plaintiff experienced double vision and a paresis of the left side of his body was discovered. On September 7 the plaintiff was examined by a specialist in neurology. A lumbar puncture revealed blood in the spinal fluid and the diagnosis of a severe cerebral concussion was confirmed.
He has ever since been a cooperative patient with an earnest, if not inordinate, desire to recover from the residuals of his injuries. The hemorrhages of the brain have, however, persisted in the impairment of his mental and physical functions. His former ability to rationalize scientifically in his chosen profession has disappeared. His acquired knowledge of the subject of chemistry is now vague. He suffers with frequent intermittent aches on the right side of his head. The tone of his voice has been lowered. He has difficulty in swallowing. The left side of his mouth droops. He has not yet regained the normal muscular functions of his left arm and leg.
The Socony Company has endeavored to alleviate his frustration by having him resume employment in the laboratory, but he has been capable of performing no service other than that of a non-technical employee.
Dr. Bell, the specialist who examined him at the hospital on September 7, 1951, and again on April 4, 1952, expressed at the trial upon the temporary exclusion of the plaintiff from the court room the following prognosis:
"Q. Doctor, what in your opinion is this man's future?
A. He is able to get along much better at the present time as far as locomotion is concerned than he did previously. He walks with a limp. He tires after relatively small exertion, but he can get around. *404 He will be able to take a job which requires little concentration and little mental ability and not too much physical work, but in my opinion, he will not be able to take a position which requires abstracting anything or a position comparable to the one that he formerly is said to have held. He can do a job such as a watchman of a plant. He can do a job such as weaving baskets that we give to people who are almost blind. From a physical standpoint, he is certainly more than 50 percent disabled, probably closer to 75 percent disabled. From a standpoint of a job such as he had before, in my opinion, he is 100 percent disabled.
Q. Doctor, what of his future?
A. He is some suspicious, I think, that he may not have as rosy a path as I have tried to indicate to him. If we can keep him hoping that everything will eventually be all right, he will get along not well, but acceptably.
Q. In what way?
A. In his hope he won't be too difficult to manage and he will always be thinking that maybe next year he will be a little better. From the standpoint of his mentality, I do not think that he will have any real increase, and if he gets to the point where he is discouraged, he will become irritable and nasty and difficult to manage at home.
Q. What would that mean?
A. That would mean that he would probably have to be sent to some sort of institution for care.

* * * * * * * *
Q. Doctor, in your opinion will there be any further recovery?
A. I do not think there will be any further mental recovery. I think that as he uses his left arm and left leg more, they will get a little stronger and he will be able to develop accessory muscles which will allow him to function a little better on the left side."
The plaintiff's salary from the Socony Company at the time of the accident was $505 a month. He had been offered a position by another company at a salary of $9,000 a year. His monetary losses of earnings and medical expenses at the time of the trial amounted to $4,139.
We are invited by counsel for the defendant to consider the quantitative allowance of damages coincidentally with the remarks of counsel for the plaintiff in his closing address to the jury.
The utterances which counsel for the defendant has extracted from the summation of plaintiff's counsel are quoted as follows:
*405 "You might say, by what legal method is the verdict collected. Well, now you are not to worry about that, and that is not in your province. You are under oath. The question for you to decide is if Mr. Lukasiewicz is entitled to a verdict, what amount does justice and reason dictate it should be?

* * * * * * * *
We have brought a suit in this case for $100,000. You may feel we are entitled to more than $100,000. You shall not bring it in. We have sued for that amount. Now, the mere fact that we sue for that amount does not mean we are entitled to that amount. The mere fact that we have sued for that amount does not mean that we could not be entitled to more than that, and that is why I have taken great pain to point out to you these figures."
Perhaps it ought to be explained that the "figures" were the mathematical capitalizing calculations derived from the stipulated present value of a dollar and the life expectancy of the plaintiff, some of which exceeded a total of $100,000.
The insistence of counsel for the defendant is that the quoted remarks projected to the jury the subtle implication that the defendant carried liability insurance of $100,000. Maybe so, maybe not. The proposition is dubitable.
We are not disposed to say that in view of the state of the evidence relating to damages in the present case the quoted declarations of counsel for the defendant were patently iniquitous. We are reluctant merely to surmise extraneous motives. There were two recognizable circumstances. The evidence warranted damages in a relatively large amount, hence the desire to eradicate from the minds of the jury any mitigation of the allowance by reason of a doubtful ability to collect them. It would have been more discreet to have had the instruction delivered by the court. Secondly, some of the calculations to which reference had been made exceeded the amount demanded.
This feature of the appeal affords us an opportunity to state that our appellate experiences have at times caused us to wonder why some trial attorneys prosecuting an exceedingly meritorious action occasionally choose to jeopardize their victory by beating the drum too loudly.
*406 It has been judicially announced with continuing frequency that although an application for a new trial is addressed to the judicial discretion of the court, it is not a boundless and illimitable discretion which can be peremptorily exercised. It has for many years been circumscribed by certain definitely established rules which survive in our modern practice and procedure. Bowen v. Healy's, Inc., 16 N.J. Misc. 113 (Circ. Ct. 1938); Hager v. Weber, 7 N.J. 201, 210 (1951); Rules 1:2-20, 4:2-6.
The mere fact that the award of damages may seem to the court to be liberal, while a circumstance to be considered, does not conclusively indicate that the verdict was the product of mistake, partiality, prejudice or passion. Gee v. Moss, 108 N.J.L. 160 (E. & A. 1931); Moore v. Public Service Coordinated Transport, 15 N.J. Super. 499 (App. Div. 1951).
The determination of the amount of money fairly and justly to compensate for bodily injuries and their past, present, and future harmful effects is characteristically a function delegated in our administration of justice to a jury whose judgments the courts are enjoined to respect. The permissible remedial purpose of the power of the court to annul a jury verdict does not authorize us on appeal merely to substitute our admeasurement of damages for that which appears to be a different but conscientious appraisement of the jury.
In our consideration of the verdict in the present case we have ascribed due significance to the conclusion of the trial judge who had the opportunity to observe the condition of the plaintiff and to the purchasing value of the present dollar.
We are not convinced that the award, although a large one, irresistibly gives rise to the inference that the verdict of the jury was the product of mistake, partiality, prejudice or passion.
The alleged prejudicial error assigned to the charge of the court is not meritorious. Any unintentional misrepresentation *407 made by the judge in his comment on the evidence was completely erased by his supplementary instructions to the jury.
Judgment affirmed.