51 N.J. Super. 90 (1958)
143 A.2d 588
MARVIN W. GREENBERG, ET AL., PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS,
v.
JAMES STANLEY, ET AL., DEFENDANTS-RESPONDENTS-APPELLANTS.
JAMES STANLEY, PLAINTIFF-RESPONDENT,
v.
SAMUEL WALDOR, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 26, 1958.
Decided June 27, 1958.
*93 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. John J. Monigan, Jr., argued the cause for defendant-appellant (Messrs. Stryker, Tams and Horner, attorneys).
Mr. Samuel A. Larner argued the cause for plaintiffs-respondents and cross-appellants Marvin W. Greenberg, et al. (Messrs. Budd, Larner and Kent, attorneys).
Mr. Abraham I. Harkavy argued the cause for plaintiff-respondent James Stanley (Messrs. Harkavy and Lieb, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
These appeals arise out of the joint trial of two actions in the Superior Court, Law Division. In the first suit Marvin W. Greenberg sues as administrator *94 ad pros. of the estate of his five-month-old deceased daughter, Amy, to recover damages for her wrongful death, while his wife, Debra Greenberg, sues on her own behalf for personal injuries, her husband joining per quod. The defendants in that action are James Stanley and Samuel Waldor, whose negligence in the operation of their respective automobiles is alleged to have resulted in Mrs. Greenberg and her child being struck on the sidewalk near the intersection of Elizabeth Avenue and Stengel Avenue in Newark on June 26, 1956, with the tragic consequences mentioned. In the second action Stanley sues Waldor for personal injuries and property damage.
The accident occurred when the two cars, Stanley's proceeding southerly on Elizabeth Avenue, and Waldor's making a left or southerly turn out of a Weequahic Park road exit slightly north of the intersection of Stengel and Elizabeth Avenues, either brushed against or approached very close to each other and Stanley's vehicle then veered to the right, mounted the southwest curb of the said intersection, and struck a public utility pole, and also Mrs. Greenberg and the child, who was being pushed by her mother in a carriage at the time.
The jury returned verdicts in favor of the Greenbergs and against Waldor, but not against Stanley, being $10,000 in favor of the administrator ad pros., $27,500 for Mrs. Greenberg, and $1,000 for Mr. Greenberg per quod, and in favor of Stanley in his action against Waldor for $10,000. On a poll, two of the jurors dissented from the exculpation of Stanley from liability to the Greenbergs, and two other jurors from the verdict for Stanley against Waldor. Motions to set aside the verdicts on grounds related both to liability and damages were denied except as to the amounts of the verdicts for the administrator ad pros. and for Stanley, which were required to be reduced to $5,000 and $7,500, respectively, as conditions for denial of new trial as to damages. Consents were filed and judgments accordingly entered. Waldor and the administrator ad pros. appeal, the latter only with respect to the reduction of his verdict. Waldor *95 raises a number of points on appeal, and our disposition of one of them will require a reversal and a new trial as to the Stanley judgment against Waldor. We therefore consider it first.

I.
At the trial the attorney for Stanley during his cross-examination of Waldor asked the latter whether he had heard some unidentified people or person at the scene of the accident shortly after its occurrence say that "a green car had cut off the Stanley car" (Waldor's car was green) after a number of rulings by the court sustaining objections by Waldor's counsel to repeated efforts by the attorney to elicit that very information, purportedly for the purpose of establishing an admission based upon Waldor's silence in the face of such statements. A motion for a mistrial on Waldor's behalf was denied. To understand the merits of the contention as to the prejudice assertedly visited by this episode upon Waldor's defense to both actions requires a fairly detailed exposition of the evidence bearing upon the manner in which both Waldor and Stanley were operating their vehicles immediately prior to the accident.
Stanley's main theory of Waldor's negligence was that the latter came out of the park at a fast rate of speed without stopping and in disregard of Elizabeth Avenue traffic and made such a wide sweeping left turn as had the effect of either blocking or threatening to block Stanley's forward progress unexpectedly and leaving him so little room on the street to avoid the Waldor car as to force him up on the sidewalk. There was also some disputed evidence that the cars brushed physically. Waldor's defense proceeds upon the thesis that he stopped before entering Elizabeth Avenue, looked in both directions, saw on the right only the Stanley car and another stopped at a red traffic light at Lehigh Avenue, a short block away, proceeded slowly to make a left, southbound turn into Elizabeth Avenue, straightening out with enough space for a car to pass him on the right, and that Stanley, coming forward speedily and without making *96 any observation on his left for traffic leaving the park, drew close alongside his car and then swerved onto the sidewalk. We may observe, preliminarily, that our close survey of the entire appendix satisfies us that there was evidence to support either theory but that the much more likely hypothesis was that the accident occurred as a result of the concurring negligence of both drivers. The choice of alternatives in the first instance was for the jury. The question before us is whether the evidential scales were prejudicially weighted against Waldor by the injection of the evidence referred to above to such an extent that denial to him of a new trial would be inconsistent with substantial justice. R.R. 1:5-3 (b).
We proceed to the testimonial background against which the question must be decided.
A Mrs. Zucker was walking with Mrs. Greenberg, both pushing their baby carriages in a southerly direction, just before the accident, the latter being nearer the street. Mrs. Greenberg was struck in the back and did not see the cars. The Waldor car first caught Mrs. Zucker's eye as it came into Elizabeth Avenue. That street is described as a wide main thoroughfare, with room for three cars abreast on each side of the center line. Stengel Avenue enters Elizabeth Avenue from the west just south of the park road exit into Elizabeth Avenue. The southerly line of the park exit, if projected at right angles across Elizabeth Avenue, just about touches the intersection of the westerly line of that street with Stengel Avenue, and that point is about 37 feet north of the southwest corner of that intersection. Mrs. Zucker said the Waldor car made a "wide sweeping turn" left, its wheels screeching. It came nearer the curb than the center of the street, leaving just enough room for another car between it and the curb. She had only a momentary glimpse of the Stanley car before it struck the pole, "going very fast."
Harry Handelman was seated parked in a car on the east side of Elizabeth Avenue about 30 feet south of the park exit, facing north. He saw the Stanley car and another car *97 stopped for a red traffic light, the Stanley car nearer the curb, at Lehigh Avenue, a "short block" north of Stengel Avenue. As the light changed, Stanley's car started "a little fast," getting a car length lead before the car alongside started. There were no cars parked on Elizabeth Avenue between Lehigh and Stengel Avenues. Stanley was going "fast" toward Stengel Avenue. Handelman also saw the Waldor car, but he was not asked which car he saw first. The Waldor car came into Elizabeth Avenue "fast" (he later said 20 miles per hour) and made a left turn, leaving sufficient space for a car to pass on the right. The turn was not a "wide turn." In making it, his speed was "medium" and his tires made no noise. The turn was completed before Stanley jumped the curb. The Stanley car was almost half-way across Stengel Avenue when the Waldor car made its turn left on Elizabeth Avenue, Stanley having reached Stengel Avenue just as Waldor came into Elizabeth Avenue. The Waldor turn was gradual. The witness heard no contact between the cars. The Stanley car had been traveling four or five feet from the curb and "fairly fast." When it reached Stengel Avenue, it swung to the right "all at once" and jumped the curb, going "fairly fast." Stanley did not apply his brakes or slow up when he veered.
On cross-examination of this witness, the attorney for Stanley, purportedly only to contradict his estimate of Waldor's speed coming out of the park, confronted him with a written statement he had given Stanley's investigators. An objection on behalf of Waldor was overruled. He then read from the statement, "As this bright car [Stanley] approached Stengel Avenue a light green car just shot out of the park road exit onto Elizabeth Avenue, turned left going south and it appeared like it might have cut off the bright car going south." Upon being asked whether this was the truth, the witness said, "That's right." It will be noted that the italicized portion of the statement does not bear upon the question of Waldor's speed emerging from the park.
Mrs. Rose Wuhl, driving her car alongside Stanley, stopped with him for the light at Lehigh Avenue. Stanley pulled *98 forward ahead of her as the light changed, maintaining his position nearer the curb. She proceeded on the lane nearer the center. She saw the Waldor car coming out of the park "fast" and making a wide sweeping turn across her path but far enough ahead of her not to cause her to slow up. The Waldor car came very close to the Stanley car. The Stanley car swerved right and went up the curb, whereupon Mrs. Wuhl came to a full stop at Stengel Avenue. Mrs Saperstein, a passenger in the Wuhl car, testified the Waldor car made a "sharp left turn" into Elizabeth Avenue.
The defendant Stanley was called as a witness for the Greenbergs. He testified he was ahead of the Wuhl car leaving the Lehigh Avenue light. He said there were cars parked on the west side of Elizabeth Avenue between Lehigh and Stengel Avenues. He first saw the Waldor car as he was "parallel with" the park entrance and it was then coming out "very fast." His vision of the park entrance was always unobstructed. Waldor made a wide left turn. When asked how close the Waldor car came "to the left-hand side" of his car, he answered, "I don't think I could have sneezed between his fender and my right fender in the rear." On cross-examination by his own attorney, Stanley first said he had already entered Stengel Avenue when the Waldor car came out of the park, but upon having his recollection "refreshed" by his depositions, said he had only reached the intersection by then. He also said that Waldor made a "sharp left turn," but later described it as a "wide left turn." He temporized as to whether he applied his brakes, saying both that he did and that he could not remember. Asked whether Waldor "was coming straight across to Stengel Avenue or making a turn," he answered, "He was making a left turn." He said he then "tried to pull to the right as far as I could go and apply my brakes." At the time he was going "approximately 23 miles per hour."
He was asked by his own attorney:
"Q. When your car reached Stengel Avenue and you saw Waldor coming into Elizabeth Avenue, what was the very first thing you *99 saw his car do? A. Come out of the park quickly and make a sharp left turn.
Q. Could you tell from the way he was making the turn whether he was going to turn into Elizabeth Avenue to the left of you or whether he was going to cut across the front of you? A. It appeared as though he would cut across the front of me." (Italics ours)
Expert proofs were offered by Stanley tending to indicate that paint particles on the left rear chromium strip of the Stanley car had come from contact with the Waldor car.
The defendant Waldor was called as a witness by the Greenberg plaintiffs. He testified that he made a full stop at the Elizabeth Avenue curb line and looked left and right. On the left he saw a car coming north from Lyons Avenue, which is a block away (on the park side; two blocks away on the west side of Elizabeth Avenue). On the right he saw the Stanley and Wuhl cars standing still at the Lehigh Avenue traffic light. No cars were parked on Elizabeth Avenue between Lehigh and Stengel Avenues. He moved into Elizabeth Avenue, starting at about five or ten miles per hour, and turned left, after which he straightened southerly and was going 15 to 20 miles per hour. Just as he started he saw the light at Lehigh Avenue turn green. When the left turn was completed he was in the middle of the western half of Elizabeth Avenue, with enough room to the center of the street to permit a car to pass on the left. On cross-examination he said there was also "plenty of room for a car to pass" on the right. He did not see the Stanley car again until he was "straightaway south," when he heard the screeching of brakes and looked through his right rear window and saw the Stanley car "coming alongside of me" and traveling "very fast." The front of the Stanley car was then alongside the driver's seat in the Waldor car. At that point the Waldor car had reached the middle of the Stengel Avenue intersection, having proceeded about 30 feet from the park exit. Then he saw the Stanley car jump the curb and hit the pole with a "very terrific impact." Waldor pulled over to the curb and got out of his car. Seeing the serious situation he drove to a store on Lyons Avenue a *100 block away, called the police, and walked back to the scene of the accident.
The portion of Waldor's cross-examination by Stanley's attorney culminating with the motion for a mistrial takes up the chronology at this point and is set forth in the appendix as follows:
"Q. You heard people talking about a green car, didn't you?
A. Yes, sir.
Q. Did you tell any of those people who were talking about a green car that you were the owner of the green car that came out of the park?
Mr. Monigan [Counsel for Waldor]: I object.
The Court: I will sustain the objection.
Q. What were these people saying about the green car?
Mr. Monigan: I object.
The Court: I will sustain the objection.
Mr. Harkavy: I think it is material.
The Court: I don't think a foundation has been laid.
Q. You say you heard people speak about a green car.
Mr. Monigan: I object. He already asked the question.
The Court: Yes. I will sustain the objection.
Q. Who were these people? A. I never saw them. I don't even know them.
Q. Were they police or pedestrians? A. Pedestrians.
Q. Were there more than one? A. Yes, quite a few.
Q. Were they standing around there? A. Yes.
Q. Could you hear what they were saying? A. I heard it from someone.
Q. What did you hear that someone say?
Mr. Monigan: I object to it. Counsel knows your Honor has just ruled on that question.
The Court: Yes. I will sustain the objection.
Q. Let me ask you this question. On page 23 of the depositions were you asked by me, `Then what did you do?'
Did you not answer, `So then I walked back to the car and I heard some remarks from people saying that there was a green car; a green car cut him off; something about that.'
Mr. Monigan: I object to that.
Mr. Harkavy: May I finish?
Mr. Monigan: Counsel is reading within the record matters which come within the term of your Honor's ruling and counsel knows very well that your Honor ruled as to remarks made by persons at the scene. Counsel is seeking by this device of reading from the depositions to get before the Court and jury the words which were to be excluded and which come within your Honor's ruling.
Mr. Harkavy: May I say to your Honor that a person by his silence when he hears something can be as equally confronted with that as though he made an affirmative statement.
*101 The Court: I will sustain the objection. You haven't laid a foundation to support that at all.
Mr. Harkavy: I am going to do it now.
The Court: You are not doing it properly. You are merely doing it by what somebody said.
Q. Let me ask you this question. When you heard these people say what you heard them say, what did you say?
Mr. Monigan: I object to that.
The Court: I will sustain the objection.
Mr. Harkavy: I just don't understand.
The Court: I have made my ruling. My ruling is it is not competent.
Mr. Harkavy: May my objection be noted on the record?
The Court: Yes, of course.
Q. Were you close to the people when they made these remarks?
Mr. Monigan: I object to that. The position of the witness in respect to the other people at the scene clearly has no relevancy to the present inquiry.
Mr. Harkavy: I will withdraw the question.
Q. Didn't you hear somebody at the scene of this accident say that a green car had cut off the Stanley car?
Mr. Monigan: If your Honor please, I would like to make a motion out of the presence of the jury."
After argument the court denied the motion for a mistrial; and it reaffirmed the rulings on the objections to the line of interrogation primarily on the ground that "the person who made the statement * * * has not been identified who would know the fact with the result that this defendant would be called upon to respond to the statement."
It is contended on Stanley's behalf that the questions to Waldor were competent under the principle applied in Ollert v. Zeibell, 96 N.J.L. 210 (E. & A. 1921), to the effect that the non-denial of an inculpating statement made in the presence of the party charged may amount to an admission of its truth where the statement was heard by the party and would naturally have been denied by him if he had a motive for denying it and did not intend to admit it. The rule is obviously not applicable in the present case as there was nothing to indicate that Waldor was conversing with or in the company of the supposed declarant, or known to him as the operator of the car. Under the circumstances, therefore, he would not "naturally" be called upon to deny *102 the statement as to the green car cutting off the Stanley car, and his silence was in no sense an admission. Silence is not an admission where "the statement is made by a stranger, whom he is not called upon to notice," Commonwealth v. Kenney, 12 Metc. 235, 237, 53 Mass. 235, 237 (Sup. Jud. Ct. 1847). See 4 Wigmore on Evidence (3d ed. 1940), § 1071, p. 70 et seq.; State v. De Paola, 5 N.J. 1, 16 (1950). The ruling of the trial court on the objection was indisputably correct. But even were it otherwise there would have been no justification at all for trial counsel deliberately blurting out the damaging question after the court had sustained objections to the line of examination five times and counsel had been heard in defense of the proposed interrogation and his contention overruled. The judge is the governor of the trial, and counsel must abide by his ruling, saving his objections for appeal.
The harmful effect of these repeated representations, in effect, by counsel to the jury that defendant had previously said that people at the scene of the accident had remarked that a green car had cut off the Stanley car is obvious. The lay jury, undeterred by rules of evidence, would be apt to be impressed by the fact that people at the scene of the accident, within minutes after its occurrence, said Waldor (the green car) cut Stanley off. Colloquially, to "cut off" another car means to suddenly and unexpectedly block the path the other would reasonably expect to take in his ordinary course. It implies egregious fault in the operation of an automobile. If Stanley was believed by the jury to have been cut off by Waldor, they would be much less likely to have deemed Stanley chargeable with contributory negligence in respect to Stanley's action against Waldor. We consider that there was so much other testimony in the record indicative of Stanley's negligence that the improper questions mentioned might well have had the effect of forestalling a verdict in Waldor's favor on grounds of Stanley's contributory negligence by creating an impression in the minds of the jury that Stanley was the helpless victim of a cutoff caught in an emergent situation without fault, and therefore not contributorily *103 negligent. Cf. Haid v. Loderstedt, 45 N.J. Super. 547 (App. Div. 1957).
It is argued the questioning was not prejudicial because there was other testimony supportive of the theory of a cutoff by Waldor. Even if there was other testimony of the same purport, this particular ascription to supposed witnesses at the scene of the accident of the powerfully indicting language mentioned would have the tendency to resolve any doubts which the jury may have entertained as to a cutoff engendered by the testimony of some of the witnesses that Waldor's turn was "sharp left" (militating against a cutoff), rather then "wide and sweeping," and other testimony indicating the cars were in lateral juxtaposition rather than Waldor's being in Stanley's lane. However, a review of the testimony will show that the only other references to the term "cutoff" were (a) when the same attorney improperly referred to a prior statement given by the witness Handelman, (b) when the term was put in Stanley's mouth by a leading question by his own attorney (see supra), and (c) when a hearsay statement was elicited on cross-examination from the witness Charlotte Cohen that Stanley had told her in the hospital that "someone had cut him off." We are fully satisfied that the issue of Stanley's contributory negligence was sufficiently debatable to have been susceptible to a materially prejudicial tipping of the scales in his favor by the substance and manner of the objectionable interrogation.
We are consequently of the opinion that the interests of substantial justice call for a new trial of the action of Stanley against Waldor. But we are not persuaded that such interests call for setting aside the verdicts in favor of the Greenbergs against Waldor. We are not influenced by the fact that their counsel had nothing to do with the prejudicial interrogation. Our differentiation of the Greenbergs' case against Waldor is, first, that here the jury had only to determine the issue as to Waldor's negligence, of which there was an abundance of evidence aside from the matter of cutoff, and, second, that the concurrence of negligence by Stanley in the joint causation by both defendants of the *104 damages sustained by the Greenbergs would not absolve Waldor as to them.
From the proofs which we have detailed it is manifest to us that Waldor's entry upon Elizabeth Avenue from the park was negligently imprudent in the face of oncoming southbound traffic on such a main thoroughfare, whether or not he stopped before coming out of the park and whether or not he cut off Stanley, in the technical signification of that phrase. Whether or not Stanley was also negligent, Waldor is liable to the Greenbergs if his own negligence constituted a substantial factor in bringing about the calamity sustained by them. Hartman v. City of Brigantine, 42 N.J. Super. 247, 261 (App. Div. 1956), affirmed 23 N.J. 530 (1957). Of course, the conclusions we are expressing were, in the first instance, for the jury, not the court. But our own impression of the predominant sweep of the evidence is perforce a vital element in our determination of the question whether the obtrusion before the jury of improper material was so prejudicial with respect to a particular issue as to require, in the interests of substantial justice, that the verdict thereon be set aside and a new trial granted. The present attitude of our courts toward trial error is not to reverse and expend anew the time, effort and expense of another trial where there has been "no real harm or injustice to the losing party." Meszaros v. Gransamer, 23 N.J. 179, 186 (1957). Insofar as the issue of Waldor's negligence is concerned, we think there was no appreciable degree of probability that the improper cross-examination affected the verdict, see Note, "Harmless Error Rule Reviewed," 47 Col. L. Rev. 450, 458 (1947); and that letting the Greenberg verdicts stand does not appear, on the whole case, to be "inconsistent with substantial justice." R.R. 1:5-3(b). As to the issue of Stanley's contributory negligence in his action against Waldor, our view is otherwise, for the reasons we have stated above.
No question has been raised concerning the effect of any determination on this point upon any right of contribution of Waldor as against Stanley in respect to the Greenberg *105 judgments. We have therefore not considered the matter and imply no opinion in respect thereto.
The adjudication in favor of the Greenbergs will therefore stand.

II.
The defendant argues that the verdict in favor of Mrs. Greenberg was excessive; that it reflects compensation for psychological damages attributable to shock and grief over the loss of her baby and that such elements of damage were not recoverable, citing Fleming v. Lobel, 59 A. 28 (N.J. Sup. Ct. 1904), and Restatement, Torts, § 312, comment e. The argument implies two facets: (a) that the verdict for the mother in effect gave impermissible damages for the death of the child, and (b) that the verdict included an unallowable element of Mrs. Greenberg's own disaffection in the admeasurement of her personal damages. The first branch of the argument may be disposed of briefly.
There is no attack by defendant on that part of the charge of the trial court wherein the jury was advised that in the action of the father as administrator ad pros. for the death of the child recovery was limited to the "pecuniary injury" of the next of kin and could not include "injuries because of love and affection and for the sentiments which arise from the death of another  in this case the baby." "Anguish and distress" over the death of the child were expressly ruled out by the court. We conclude the jury was not undertaking to give damages for the death of the child in fixing the mother's verdict.
There can be no doubt, however, and plaintiffs admit it, that the verdict did reflect the jury's appraisal of the severe psychosomatic disturbances to this young woman arising out of this accident, and that the psychoneurosis she developed as a result was significantly affected by the fatal injury of the infant as part and parcel of the accident episode. We have concluded, however, that her entire physical and mental condition was directly attributable to the accident, that her disabilities constituted an integral situation in which the *106 sudden, unexpected and severe physical trauma was inextricably intertwined with the emotional shock over the simultaneous fatal injury to the infant, and that damages were recoverable for her entire resulting injuries and disturbances.
We need not detail the purely physical injuries. There was a serious back injury and a severe laceration of the hand, involving an unsightly scar and a degree of permanent functional disability. The medical testimony was to the effect that the main effect of the accident on the woman was a "functional psychoneurosis with a marked reactive depression." Testimonial details show the severity of the condition and the unpredictability of its duration. The medical prognosis was "guarded." On cross-examination plaintiff's expert psychiatrist admitted that the death of the child was "one of the sources" of her neurosis but that the neurosis was a product of "the accident, the injury, the whole constellation. It wasn't just the death of the child." He explained that the "unanticipated" character of the accident was a strong contributive factor of the resulting neurosis.
This is not a case of emotional disturbance resulting from merely witnessing the fatal injury of a child. As New Jersey does not allow a cause of action for mental anguish where there has been no physical impact upon the plaintiff, even where his fear is for his own safety, Ward v. West Jersey & S.R. Co., 63 N.J.L. 383 (Sup. Ct. 1900), the infliction of anguish by the negligent injury of another, without physical trauma to the plaintiff, would be equally irremediable. But where the defendant's negligence occasions some personal physical injury to the plaintiff, no matter how slight, the plaintiff may recover for fright, shock and mental agitation as part of his damages. Buchanan v. West Jersey R.R. Co., 52 N.J.L. 265 (Sup. Ct. 1890); Consolidated Traction Co. v. Lambertson, 59 N.J.L. 297 (Sup. Ct. 1896); Parker, "Tort Law of Personal Injuries," 8 N.A.C.C.A.L. Rev. 156, 166 (1951).
While there appears to be no New Jersey case directly in point, it has been held elsewhere, however, that the mere *107 fact that the plaintiff suffers personal injury will not ipso facto warrant recovery for fright or shock over the simultaneous injury or endangerment of a loved one or others in the same accident episode. Clough v. Steen, 3 Cal. App.2d 392, 39 P.2d 889 (D. Ct. App. 1934); Taylor v. Spokane P. & S. Ry. Co., 72 Wash. 378, 130 P. 506 (Sup. Ct. 1913); Annotation, 18 A.L.R.2d 220, 234 (1951). See 2 Harper and James, Law of Torts (1956), § 18.4, pp. 1031-1039. The case of Fleming v. Lobel, supra, cited by defendant, which is not too satisfactory in its factual presentation, is probably authority only for the same proposition, i.e., that the mere fact that the fright over the injury to another is simultaneous with the injury to the plaintiff will not justify recovery for damages for the fright where that condition is not causally related to a neurosis in the plaintiff at least substantially induced by the plaintiff's own injury and the psychological consequences peculiar thereto. The latter hypothesis is the one supported by the proofs here, and the question is recoverability for the entire, inseparable, resulting psychiatric complex, induced partly by the emotionally shocking and unexpected trauma to the plaintiff herself and partly by her simultaneous concern for her injured child, both conditions interacting to produce the whole resulting psychoneurosis and its sequelae.
Relevant in this connection is the rationale of the Maryland court in Resavage v. Davies, 199 Md. 479, 86 A.2d 879 (Ct. App. 1952). There plaintiff sought recovery for mental conditions brought about when she saw defendant's car run over and kill her two children. The court sustained a demurrer to the action, holding that defendant breached no duty to plaintiff. The decision turned not on damages but on the existence of an actionable wrong. For our purposes, the distinguishment by the court of the earlier case of Bowman v. Williams, 164 Md. 397, 165 A. 182 (Ct. App. 1933), is significant. There defendant's truck ran into plaintiff's house, and, although no one was traumatically injured (and there would therefore be no recovery in New Jersey), plaintiff sustained physical injury to his health as a result of *108 shock caused by his fright and alarm for his children and himself. In allowing recovery the court in the Bowman case said (165 A. at page 184): "There was no basis to differentiate the fear caused the plaintiff for himself and for his children, because there is no possibility of division of an emotion which was instantly evoked by the common and simultaneous danger of the three." This reasoning appeals to us as cogent and applicable to the damages problem confronting us here, notwithstanding there would be no cause of action in New Jersey because of the absence of physical trauma. See also Prosser, Torts (2d ed. 1955), § 37, p. 181.
On the entirety of the evidence we are not disposed to disturb the trial court's determination that the award of $27,500 should not be set aside as so excessive as to demonstrate mistake, partiality, prejudice or passion. Moore v. Public Service Coordinated Transport, 15 N.J. Super. 499 (App. Div. 1951); Lukasiewicz v. Haddad, 24 N.J. Super. 399 (App. Div. 1953).
What we have said above disposes of the objection of the defendant to the refusal of the trial court to entertain his requested charge No. 7 concerning the proper measure of Mrs. Greenberg's damages in respect to fright and emotional disturbance. Moreover, the first sentence of the requested charge contains the unjustified assertion that because Mrs. Greenberg did not see either automobile before being struck there could be no damages for fright. Fright may well be contemporaneous with the injury.

III.
We consider under this heading both defendant's contention that the reduced verdict of $5,000 for the death of the child is not supportable on the evidence and the administrator's appeal from the reduction of that verdict from $10,000 to $5,000.
The child was only five months old at death. Necessarily plaintiffs could not adduce specific evidence of the prospective pecuniary losses of the parents through deprivation *109 of the child's earnings until her emancipation or majority, or, mayhap, of voluntary contributions thereafter. See Morhart v. North Jersey Street Ry. Co., 64 N.J.L. 236, 237, 238 (E. & A. 1900). If the jury were not permitted to use their best judgment notwithstanding the paucity of proof, there would result the injustice of a total denial of recovery. Some degree of conjecture in such a situation is fairly unavoidable.
The complaint of the parents over the reduction of the verdict is also unjustified. The court's action was not manifestly unreasonable. The recovery must be geared to the prospective excess of pecuniary gain to the parents from the child either in money or in services, which is always problematical, over their outlay on its behalf during its upbringing, which is practically certain and usually substantial. Cf. McStay v. Przychocki, 7 N.J. 456, 462 (1951).
The verdict for the death of the child stands.

IV.
The polling of the jury revealed that jurors Nos. 5 and 8 were of the opinion that the Greenberg verdict should have gone against Stanley as well as Waldor. Since, moreover, jurors Nos. 3 and 9, on being polled, expressed dissent from the Stanley verdict against Waldor, the defendant Waldor argues the latter verdict is vulnerable because shown to have been rendered without the conscientious concurrence of at least ten jurors on the points both of Waldor's negligence and Stanley's innocence of contributory negligence. But since we have already concluded there must be a new trial of Stanley's action against Waldor we need not determine the point. The defendant does not argue that the polling of the jurors shows any infirmity in the Greenbergs' verdict against Waldor. Cf. Malinauskas v. Public Service Interstate Transp. Co., 6 N.J. 269 (1951). Defendant Waldor argues, however, that the amount of the Stanley verdict was excessive (the court reduced it from $10,000 to $7,500 and Waldor contends even that is excessive) and that this circumstance and the inconsistency of the position of *110 the jurors as to the Stanley verdicts require the conclusion that all the verdicts of this jury were untrustworthy and should be set aside as to all parties and issues. We cannot agree. The Greenberg verdicts, subject to the reduction by the trial court of the verdict in the death action, were fairly sustainable in the evidence on both liability and damages, unaffected by any errors or improprieties, if there were any, in the jury's determinations in Stanley's action against Waldor, and will not be disturbed. See Dahle v. Goodheer, 38 N.J. Super. 210 (App. Div. 1955), certification denied 20 N.J. 534 (1956).
In view of the retrial ordered, moreover, we have no occasion to consider the claim of excessiveness of the Stanley verdict.

V.
A number of other alleged trial errors are asserted by the defendant. These include the denial of a motion to permit interrogation of the jurors with respect to a news story mentioning the amount of the recovery sought in the Greenberg action, refusal of certain of the defendants' requests to charge the jury and a portion of the court's charge pertaining to the rule of sudden emergency. These points have all been carefully considered and we find no basis in any of them to disturb the Greenberg judgments.
The judgments of the Greenberg plaintiffs are affirmed, with costs. The judgment in favor of Stanley against Waldor is reversed and a new trial awarded, costs to abide the event.