NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4137-14T3

ALEXANDRA RODRIGUEZ,

     Plaintiff-Appellant,

v.

WAL-MART STORES, INC., and/or
WAL-MART STORES EAST, LP, and/or
WAL-MART STORES EAST I, LP,

     Defendants-Respondents.

---

> **APPROVED FOR PUBLICATION
> AS REDACTED
> April 27, 2017**
>
> **APPELLATE DIVISION**

Argued April 3, 2017 — Decided April 27, 2017

Before Judges Sabatino, Nugent and Haas.

On appeal from Superior Court of New Jersey,
Law Division, Gloucester County, Docket No.
L-844-12.

Andrew A. Ballerini argued the cause for
appellant.

Patrick J. McDonnell argued the cause for
respondents (McDonnell & Associates, P.C.,
attorneys; Mr. McDonnell, Kailee H. Farrell
and Gwyneth R. Williams, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

Plaintiff in this personal injury case appeals on several

grounds from a no-cause jury verdict.  Among other things,

plaintiff argues that she was unduly prejudiced by the

admission, over her objection, of extensive testimony from a defense medical expert opining that she had magnified her symptoms and her alleged injuries from the accident. The testifying doctor was not a psychiatrist, psychologist, or other mental health specialist. Plaintiff contends that the admission of this expert testimony unfairly impugned her overall credibility and thereby deprived her of a fair trial on both liability and damages.

For the reasons that follow, we conclude that the expert's opinions on symptom magnification were improperly admitted, and that plaintiff was sufficiently prejudiced by that ruling to be entitled to a new jury trial on all issues. In doing so, we adopt the reasoning of other jurisdictions that have disallowed such expert opinions about symptom magnification, malingering, or other equivalent concepts in civil jury cases, including the Eighth Circuit's seminal opinion in Nichols v. American National Insurance Company, 154 F.3d 875 (8th Cir. 1998).

A qualified expert is not precluded, however, from providing factual testimony recounting observations the expert made about plaintiff's physical movements or responses to testing during an examination, subject to exclusionary arguments under N.J.R.E. 403 that may be asserted on a case-specific basis. Nor is a qualified expert precluded from testifying that

a plaintiff's subjective complaints appear to be inconsistent with objective medical test results or findings. In addition, we do not foreclose the admission of opinion testimony concerning symptom magnification or similar concepts from a qualified expert in a non-jury case, also subject to Rule 403.[1]

I.

Plaintiff Alexandra Rodriguez claims that she was injured when a metal rack display (known in the retail field as an "endcap") suddenly fell on her when she was shopping at a Wal-Mart store[2] in Turnersville on June 6, 2010. Photographs taken after the incident show that there were garments on racks attached to the endcap. According to plaintiff's liability expert, a professional engineer, the portion of the rack that allegedly fell on plaintiff, inclusive of the displayed clothing, weighed approximately 141 to 157 pounds.

The endcap is designed to be secured by a single metal clip at the top and two clips at the bottom. The top clip slides

---

[1] In the unpublished portion of this opinion, we address and reject as unmeritorious the other discrete arguments plaintiff has advanced on appeal.

[2] Plaintiff's complaint named as defendants "Wal-Mart Store, Inc." and "Wal-Mart Stores East, LC." Defendants state that the proper name of the business entity responsible for the Turnersville store is "Wal-Mart Stores East, LP." For ease of discussion, we shall refer to plaintiff's adversary as "Wal-Mart."

into a vertical metal frame, held in place with the assistance of gravity.

Plaintiff described the incident on several occasions, doing so with varying details. A few days after the incident, plaintiff stated in an interview that she did not hit the endcap shelf as she turned the corner with her shopping cart. At her later deposition, she testified that she "nipped" the shelf, and that the basket on her cart struck the fixture's horizontal bars. In her trial testimony, plaintiff could not recall stating that she had hit her cart against the rack. She was unclear about what portion of her body came into contact with the display when it fell.

Although plaintiff was accompanied at the store by a friend and her teenage daughter, neither of them testified at trial. No store personnel witnessed the endcap fall. Store employees did attend to plaintiff after the incident, and called for medical assistance. Plaintiff reported pain in her right arm, and was taken to a local emergency room.

Plaintiff was treated by several doctors following the incident. A post-accident MRI study revealed a right upper ulnar neuropathy. Plaintiff contends that condition was caused by the incident, whereas Wal-Mart disputes such alleged causation. Eventually in 2013, plaintiff had a spinal cord

stimulator implanted to relieve what she contends was her persisting pain. She also complained of swelling of her hands and other lingering conditions.

Plaintiff presented medical testimony at trial from several experts. They included an orthopedic surgeon, a neurologist, and a family medicine practitioner with expertise in what is known as Complex Regional Pain Syndrome ("CRPS"). The latter expert diagnosed plaintiff with "Type 2" CRPS. He further opined that her condition, despite treatment efforts, was likely to be permanent.

Wal-Mart denied plaintiff's contentions of liability and compensable injury. With respect to liability, Wal-Mart disputed that the endcap was in a dangerous condition. The company also disputed that the fixture actually fell on plaintiff and, as she alleged, trapped her. Among other things, the defense presented testimony from an employee familiar with maintenance at the store, who stated that the endcap had not been noticed to be unstable or hazardous before plaintiff's alleged incident.

During defense counsel's cross-examination of plaintiff's liability expert at trial, the engineer acknowledged that it would have been physically impossible for the display to fall had it merely been bumped by plaintiff's shopping cart. The

engineer also acknowledged that, if the display fell, it would not have landed solely on plaintiff, but also would have contacted the opposite wall.

Plaintiff contended that these particular statements by her liability expert are not dispositive, arguing that there were ample factual grounds for a jury to find that the store is liable for the happening of this accident. She requested, and the trial court issued, an instruction advising the jury that there was no proof of comparative negligence on her part. In addition, plaintiff requested a jury charge on the doctrine of res ipsa loquitor. Over Wal-Mart's objection, the trial court issued that charge, albeit with a modification we discuss in Part III, infra.

Aside from liability, Wal-Mart also presented competing proofs on damages. It called several medical experts to support its theory that plaintiff was not injured in the alleged accident, and that the physical symptoms and sensations she complained of were caused either by other accidents or by her underlying physical and psychological conditions.

In its verdict, the jury unanimously determined that plaintiff failed to meet her burden of proving Wal-Mart's liability. The jury consequently did not address the damages questions on the verdict form.

Plaintiff now appeals, raising several issues of claimed error. Those issues, which we list in a different order than presented in her brief, include: (1) improper and unduly prejudicial admission of the defense neurologist's testimony on "symptom magnification" and similar concepts; (2) improper and unduly prejudicial admission of testimony by another defense medical expert attempting to discredit the general viability of a diagnosis of CRPS; (3) improper admission of evidence of plaintiff's prior accidents and injuries; (4) failure to omit from the res ipsa jury charge a reference to a plaintiff's "voluntary act"; (5) other trial errors; and (6) cumulative error.

## II.

The admissibility at a civil jury trial of "symptom magnification," or equivalent opinion testimony, from a defense medical expert raises an issue of first impression that has not been decided in any prior reported case in this state. Because this is a legal issue, we review the trial court's ruling on the subject de novo. Royster v. N.J. State Police, 227 N.J. 482, 493 (2017); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A.

During its defense case, Wal-Mart proffered testimony from a medical expert, a neurologist, who had examined plaintiff almost a year before the trial. The medical examination took about two hours.

The record shows that this defense expert had substantial credentials in several disciplines. He was board-certified in neurology, internal medicine, and electrical studies of the brain. He completed a residency in neurology at Duke University, as well as a fellowship in disorders of the electrical activity of the brain and the spine. As of the time of his testimony, the expert had privileges at two New Jersey hospitals, and practiced adult neurology full time.

The expert admittedly was not a psychiatrist or psychologist, although he noted that he had treated patients with both neurological problems and psychological problems. The expert asserted that there was some "overlap" between the disciplines of psychiatry and neurology, but conceded that the certification requirements of those two respective specialties were "very, very different[.]"

The trial court deemed the expert qualified in the respective fields of neurology, internal medicine, and

electrical studies of the brain. Plaintiff's counsel did not object to this finding of the expert's qualifications.

Prior to the neurologist addressing symptom magnification and other related topics, plaintiff raised an objection to the expert presenting opinions on such matters. The trial court accordingly conducted a hearing pursuant to N.J.R.E. 104, outside of the jury's presence, at which the expert was questioned by both counsel. The expert enhanced his testimony with demonstrative slides, with highlights of key points, which he had personally prepared to display to the jurors.

The defense expert opined that the symptoms of persisting pain plaintiff complained of were inconsistent in several respects with his observations of her during her medical examination, and also with certain aspects of the objective studies, including the MRI. More specifically, the expert stated that the patient's responses were consistent with what he referred to as "somatization," which he described as "a process where individuals describe experiencing symptoms of various types that are not accompanied by objective findings and interpretations." However, the expert did not formally diagnose plaintiff with a somatoform disorder, acknowledging at the Rule 104 hearing that he would need to involve a mental health expert

to confirm such a diagnosis. The expert also stated that, in his opinion, plaintiff was magnifying her symptoms.

After the trial court heard the expert's proposed testimony, counsel presented arguments on plaintiff's motion to exclude the expert's opinions on "symptom magnification" or equivalent concepts. During that colloquy, plaintiff's counsel cited to the trial court the Eighth Circuit's decision in Nichols, supra, 154 F.3d at 884, which disallowed such opinion testimony where it is used as a "thinly veiled comment on a witness'[s] credibility."

The trial court overruled plaintiff's objection. At the outset of its ruling, the court did acknowledge that, as a general proposition, "we can't have witnesses that testify to what they think [is] somebody's credibility." Nonetheless, the court found no bar to the defense neurologist opining that there was "no objective basis" to support plaintiff's expressed complaints and that she thereby was "exaggerating." The court concluded that the expert had provided a sufficient foundation within his fields of expertise to present opinions on such matters.

The trial court did not address in its oral ruling plaintiff's citation of Nichols. Nor did it discuss any considerations of alleged undue prejudice under N.J.R.E. 403,

which, as plaintiff's counsel had argued, can justify the exclusion of otherwise-admissible evidence. Even so, the court implicitly recognized at least the potential for the jurors to place undue reliance on the expert's opinions because it announced, <u>sua</u> <u>sponte</u>, that it would provide a cautionary instruction to the jurors. That instruction would remind the jurors that, ultimately, it is their function "to judge the credibility of the plaintiff."

B.

At that point, the jurors returned to the courtroom and the defense neurologist resumed his testimony. We present here, in excerpted form, some of the key portions of the expert's opinions on symptom magnification and cognate subjects:

> [DEFENSE COUNSEL]: All right Doctor. I think there's, left off at the slide that's, kind of <u>conclusions about what you're able to determine after your exam</u>. First of all were you able to determine one way or the other whether there was a soft tissue injury to the right side of her neck or her right arm?
>
> A: Yeah, the character of her initial complaints would make sense for that. So she mostly like did have a strains involving the right neck area, possibly the right shoulder region. And she may have even bruised her right arm, although there was no evidence of any external trauma.
>
> Q: And again was that, her complaint or subjective, was that supported by any contemporaneous medical records in that they

A-4137-14T3

observed any sort of spasm of the neck or bruising of the arm or anything like that?

A: I think the only description initially was that she had some tenderness in those areas, but there was no described swelling, bruises, contusions, lacerations, anything objectively they could see.

Q: And did she sustain any disc herniation as a result of anything that happened in June of 2010?

A: No.

Q: How about any damage to the nerves of her right or her left arm?

A: No.

Q: Doctor did you have, the next slide deals with the diagnosis of complex regional pain syndrome. I think at the time she was complaining about it in her right arm.

A: Which time?

Q: When you examined in her March of 2014.

A: Correct, it was limited to the right upper extremity.

Q: Okay. First of all was the presentation in her right arm, <u>was that a usual presentation for complex regional pain syndrome</u>?

A: Well again there are certain findings both subjective and objective that we look for. <u>Subjectively she had most of those complaints that one would look for. Objectively I could not verify those findings</u>.

A-4137-14T3

> But they're also accompanying other non-physiologic findings. In other words, there [are] other findings for example with her right face that didn't make any sense and therefore that brings up concern that some of the findings may not be of true nerve origin.
>
> [(Emphasis added).]

At this point, the expert introduced to the jurors the concept of "somatization":

> Q: And Doctor what's the term somatization? Did you reach any sort of conclusion or consider the fact of somatization? And what exactly is that if you could explain that to the jury?
>
> A: Basically it's a clinical state where one would present at different times with different complaints. The complaints would be evaluated fully. You know, for example, someone can present with chest pain, abdominal pain, different types. You work them up. You find nothing specific.
>
> Eventually you come to the conclusion that there's nothing usually due to medical reasons. And repeated, that type of history would then be referred to as a somatoform disorder, somatization.
>
> [(Emphasis added).]

The expert went on to elaborate how he reached his opinion that plaintiff's reported symptoms were consistent with such a "somatic" process:

> Q: Is there an overlap between what let's say a neurologist or a belly doctor would do and a psychiatrist would do in

13

terms of trying to find out, trying to reach a conclusion about somatoform disorders?

A: Sure. <u>Before anyone comes to that conclusion, one takes a great deal of hesitation. One doesn't want to diagnose that until you've made sure that there is nothing medically going on</u>.

So the first obligation of the physician is to explore the complaints fully and totally. Do whatever tests are necessary to make sure there's no explanation.

And then one may even want to get other opinions. And then if one can't find a cause for it, then it comes down to a clinical decision, whether it's due to anything medical or sometimes we can't find causes for things.

<u>But if it's repeated over a period of time with different symptoms, then one can define that as a somatoform process</u>.

Q: <u>Now Doctor I didn't pull your box up, but you've got about a banker box full of records and you evaluated her. Before you reached that opinion about somatization, did you go through [that] type of analysis in this particular case</u>?

A: Well the advantage people like me have sometimes is <u>we have a volume of records to look at</u>, you know. One can go back and look at information for, you know, years if not decades.

. . . .

And there is <u>a background history of claims of chronic and tractable pains involving her abdomen for which she's had extensive work ups. There are claims of intractable disabling pains involving her</u>

14                                              A-4137-14T3

> lower back and her right leg. And the work up I saw really didn't explain it adequately.
>
> And there were other claims at different times of pain difficulties. And this was in a context of ongoing psychiatric difficulties. And that just brings up concern that things like a somatoform disorder may be there.
>
> [(Emphasis added).]

Defense counsel then moved the questioning to the related topic of "symptom magnification." Before the expert opined on that concept, the court gave the jurors, as it had planned, the following limiting instruction:

> THE COURT: Yes, the Doctor had within his field of his experience and expertise, utilized what he sees and observes to determine whether the symptoms that are being expressed have some objective basis for them and give an opinion or a basis for them. He can give an opinion with regard [to] that.
>
> But it relates to credibility. And you should understand that ultimately you are the people that judge the credibility of the plaintiff. And so you can take what the Doctor says. But ultimately it's your decision as it relates to credibility of the plaintiff and determine from your determination what to accept and what not to accept.

The expert then proceeded to define symptom magnification. He explained why, in his opinion, plaintiff had exhibited that characteristic:

[DEFENSE COUNSEL]: Doctor as a result of your exam and the review of the records, did you form an impression that the plaintiff might be magnifying her symptoms and you can describe for us what symptom magnification is.

A: Sure. The answer is yes, <u>there was some observations that would be compatible with symptom enhancement or magnification</u>.

And basically what it is is a subjective evaluation, looking at someone, testing them. For example, applying pressure to let's say the neck area when one's complaining of pain. <u>And when one barely touches the skin or moves the skin sideways and someone is screaming, okay, that's disproportionate to what one would expect in terms of that evaluation</u>.

And that's what <u>symptom magnification is, is a response that seems to be excessive compared to what should be observed in a given situation for most individuals</u>.

And again everyone is a little different because of their psychological make up.

[(Emphasis added).]

In a related vein, the neurologist offered his opinions on whether plaintiff's symptoms of pain were "psychogenic" in nature:

Q: <u>Doctor in terms of putting it together, what is psychogenic pain and psychogenic [sic], can it explain real physical findings over time</u>?

A: <u>Well a psychogenic pain is a very complicated process. One is, an implication is that there is a lot of psychological</u>

16

input into the pain. So for example if somebody's upset and you go over and you tap their shoulder a little bit, okay, they may scream and yell where somebody else you touch them, they don't even blink an eye. So your psychological makeup determines how you respond to pain.

But if you are complaining of pain, one needs to go all out to make sure that there's nothing on a physiologic basis first before you come to that conclusion.

Q: And is, all the things that you observed in the exam, was that consistent with her prior history, her 10 year history before hand?

A: Well I think it lays the foundation that there was predisposition to chronic pain. Not only chronic pain, but chronic disabling pain. And this was interacting with her psychological state. So there was a history.

[(Emphasis added).]

On cross-examination, plaintiff's counsel attempted to neutralize the defense expert's opinions that plaintiff exaggerated her symptoms:

[PLAINTIFF'S COUNSEL]: And in this case, nobody's diagnosed her with somatization in these records, did they?

A: Well the physicians treating her were treating her for pain and no one approached that diagnosis, no.

Q: And you have records that go back to the '90s, correct?

A: No, I have some records. I don't have all her psychiatric records.

Q: So you're telling this jury something about somatoform disorder. <u>You're not a psychiatrist. You're not a psychologist and you don't have all the psychiatric records, true</u>?

A: Well they weren't supplied because she had psychiatric records going back to her teenage years.

Q: All right, but is what I said true?

A: I'm not sure. Repeat the question.

Q: Sure. <u>You're telling this jury she has somatoform disorder but you don't have all the psychiatric records and you're not a psychologist or a psychologist, is that all true</u>?

A: <u>I don't need the psychiatry necessarily to make that assumption</u>.

Q: I just want to know if what I said is true.

A: <u>That's true</u>.

Q: And with somatization, <u>even if she had somatoform disorder</u>, somehow there was, if the moon was blue and we all agreed on something in this case and she, we all agreed she had somatoform disorder which we don't obviously, <u>in somatoform disorder isn't the pain real to the patient</u>?

A: <u>To them it's real, yes</u>.

Q: And it's actually medical[ly] contraindicated to tell a patient that it's all in their head, if they were to have somatoform disorder, isn't that true?

A: I don't think the word medically contraindicated. I think <u>it depends on the</u>

A-4137-14T3

individual. It depends on the approach to it. It often is ineffective because to them it's all real.

Q: All right. Can we say it's not a good idea to tell a patient who has somatoform disorder that it's all in their head?

A: That's not a good idea, correct.

[(Emphasis added).]

Beyond this, counsel also questioned the expert about whether plaintiff had exhibited "pseudo seizures." The expert agreed that such events are considered "a form of somatization," and that "at times" a patient may be "volitionally" presenting such symptoms. As a possible illustration of such a somatic or "psychogenic" event, the expert referred to a situation in which plaintiff went to the hospital after an argument at home, complaining of "breathing difficulties, shaking, fatigue, dizziness, and also claimed to have left arm pain and numbness." That episode, diagnosed as an "anxiety reaction," was declared by the expert to be "part and parcel of the entire history" of episodes "that would suggest or support that there were psychological features contributing to her medical state."

No other testifying witnesses contested the defense neurologist on these points. Consequently, he provided the only testimony the jury heard about symptom magnification, somatization, and the like.

A-4137-14T3

The courts of this state have long adhered to the cardinal principle that "[i]t is within the sole and exclusive province of the jury to determine the credibility of the testimony of a witness." State v. Vandeweaghe, 351 N.J. Super. 467, 481 (App. Div. 2002), aff'd, 177 N.J. 229 (2003). "[T]he jury is charged with making credibility determinations based on ordinary experiences of life and common knowledge about human nature, as well as upon observations of the demeanor and character of the witness." State v. Jamerson, 153 N.J. 318, 341 (1998) (citing State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991), aff'd, 130 N.J. 554 (1993)).

In furtherance of this exclusive jury function, "[w]e do not allow one witness to comment upon the veracity of another witness." Vandeweaghe, supra, 351 N.J. Super. at 481-82 (internal citation omitted).[3] This prohibition applies even if

---

[3] We distinguish in this regard N.J.R.E. 608(a), which allows, subject to certain conditions and exceptions, the credibility of a witness to be attacked or supported by reputation or opinion testimony relating to a witness's general character for untruthfulness. That Evidence Rule disallows proof of such character traits to be proven by specific instances of conduct, with limited exceptions not pertinent here. In the present case, Wal-Mart's expert neurologist repeatedly referred on direct examination to specific instances of conduct by plaintiff, which Rule 608 would not permit. Moreover, the present case involves the credibility of plaintiff in a narrower sense relating to her account of the accident and her alleged
(continued)

the witness proffered to render such a credibility opinion is an expert. See, e.g., State v. Henderson, 208 N.J. 208, 297 (2011); State v. Papasavvas, 163 N.J. 565, 613 (2000); Jamerson, supra, 153 N.J. at 341. "Experts may not offer such testimony because 'credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance.'" Jamerson, supra, 153 N.J. at 341 (quoting J.Q., supra, 252 N.J. Super. at 39). See also Biunno, Weissbard & Zegas, Current New Jersey Rules of Evidence, comment 1 on N.J.R.E. 702 (2016) (reiterating this principle and citing additional cases applying it).

Having underscored this well-established prohibition, we turn to the admissibility at a jury trial of expert opinion about a testifying plaintiff's "malingering," "symptom magnification," or other related concepts. The Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), a major authoritative text classifying mental disorders, defined "malingering" as "the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation,

_____

(continued)
ensuing injuries, rather than her general character for truthfulness or untruthfulness.

evading criminal prosecution, or obtaining drugs." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 683 (4th ed. 1994). <u>See also</u> <u>Fitzgerald v. Roberts, Inc.</u>, 186 <u>N.J.</u> 286, 299 n.6 (2006) (quoting this definition from <u>DSM-IV</u>).[4] The connotations of that term readily can conjure up negative concepts of a person's intentionally wrongful conduct, deceit, greed, evasion of duty, or criminality. To brand a person a "malingerer" is essentially to declare him or her a faker, a liar, a slacker, or a sloth.

Although there is no clinical definition of "symptom magnification," that term essentially conveys the notion of malingering, perhaps with more polite or scientific-sounding phraseology. "In a medical context . . . words such as 'malingerer' and 'malingering' are not often seen in doctor's reports." Samuel D. Hodge and Nicole Marie Saitta, <u>What Does It Mean When a Physician Reports That a Patient Exhibits Waddell's Signs?</u>, 16 <u>Mich. St. J. Med. & Law</u> 143, 155 (Winter 2012). "Instead, physicians utilize phrases such as '[p]ositive

---

[4] Malingering was removed from the substantive portion of the newest edition of the <u>DSM</u>, but remains as a diagnostic code. <u>See</u> American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 850 (5th ed. 2013) (identified by the authors as "<u>DSM-5</u>" rather than "<u>DSM-V</u>").

Waddell's signs,'[5] 'secondary gain,' 'factious disorder,' 'within the patient's voluntary control,' 'motions voluntarily limited to the patient,' and 'subjective symptoms and complaints out of proportion to the objective signs' to indicate malingering behavior." Ibid. (internal citation omitted).[6]

To be sure, we acknowledge the phenomenon of malingering is real. Some claim it to be widespread, particularly for chronic pain patients. Id. at 154. Whatever the actual prevalence rate of malingering may be, we do not lose sight of the possibility

---

[5] Waddell's signs refer to a series of tests developed by Gordon Waddell and his research colleagues in 1980 to identify a group of inappropriate responses to a doctor's physical examination. Hodge, supra, 16 Mich. St. J. Med. & Law at 156 (citing Gordon Waddell, et al., Nonorganic Physical Signs in Low-Back Pain, 5 Spine 117 (March/April 1980)). The five signs, which were not developed for litigation purposes, include: (1) tenderness testing, (2) simulation testing, (3) distraction testing, (4) regional disturbances, and (5) overreaction to stimuli. Id. at 157-58. According to Waddell, it is clinically significant if three or more of these signs are present. Id. at 157. As Professor Hodge and his colleague note in their article, Waddell signs are controversial and have been criticized by some as non-reliable, although the tests have been admitted by some tribunals, including worker's compensation agencies and the Social Security Administration. Id. at 162-64.

[6] The concept of "somatization," which was also a term used by the defense neurologist in this case, has a related but arguably less pejorative meaning. As noted in Fitzgerald, supra, somatization disorder has been defined as "a chronic condition in which a person experiences numerous physical complaints that implicate psychological problems rather than an underlying physical problem." 186 N.J. at 298-99 n.5 (citing DSM-IV, supra, at 446). The term "somatization disorder" has been replaced in DSM-5 with "somatic symptom and related disorders." See DSM-5, supra, at 309-15.

that a personal injury claimant could be exaggerating or fabricating his or her reports of pain, weakness, and other subjective symptoms.

Indeed, we are by no means declaring here that opinion testimony on malingering or related concepts from a qualified professional is inadmissible "junk science" or per se unreliable. See N.J.R.E. 702; Hisenaj v. Kuehner, 194 N.J. 6, 17 (2008). Instead, we shall assume for the purposes of our analysis that qualified expert opinion on malingering or cognate concepts could have some probative value in evaluating whether a personal injury plaintiff is telling the truth about his or her claimed injuries. Our concern here is on the capacity of such expert testimony to usurp or unduly influence, as a practical matter, a jury's paramount role in evaluating a plaintiff's credibility.

The expert's opinions about symptom magnification (and equivalent technical-sounding medical terms) stamp an erudite imprimatur upon a defense attack on plaintiff's overall credibility. The same effect can occur reciprocally, as at least one unpublished decision from our court has observed, when a plaintiff presents a medical expert to opine that he or she did not display on examination any indicia of symptom magnification or malingering. In either instance, laypersons on

juries might too readily accept the expert's gross assessment at face value, despite their own critical independent role as the ultimate judges of witness credibility.

These concerns about the undue impact upon jurors of such expert testimony about malingering were detailed at length in the Eighth Circuit's influential opinion in <u>Nichols</u>, <u>supra</u>, 154 <u>F.</u>3d at 882-84. The plaintiff in <u>Nichols</u> sued her former employer for sexual harassment and constructive discharge. She alleged that she was forced to resign after a superior had sexually assaulted her and made degrading comments about her. <u>Id.</u> at 878-80. She claimed she suffered mental anguish, pain and suffering, and emotional distress due to her employer's conduct. <u>Id.</u> at 880.

The defendant employer in <u>Nichols</u> presented expert testimony from a psychiatrist who had performed an interview and evaluation of the plaintiff. <u>Id.</u> at 881. The psychiatrist concluded that the plaintiff had a personality disorder and "undifferentiated somatoform disorder." <u>Id.</u> at 882. Over the plaintiff's objection, the expert opined to the jurors that the plaintiff had "poor psychiatric credibility" as well as "a tendency to blur fantasy with reality." <u>Ibid.</u> The expert punctuated these negative opinions by telling the jury that the plaintiff had "recall bias" and that her accounts of what had

occurred were affected by "secondary gain" and "malingering." Ibid. The expert defined "secondary gain" to the jurors as signifying the possibility that the plaintiff's claimed symptoms were motivated by financial gain, such as the prospect of being awarded money damages in litigation. Ibid. The expert defined "malingering" for the jury as "feigning or making up symptoms for the purpose of secondary gain." Ibid.

On appeal, the majority opinion of the Eighth Circuit in Nichols reversed the jury's verdict for the defendant employer. The court specifically overturned the trial court's admission of the psychiatrist's expert opinions about the plaintiff's malingering and related perceived characteristics. Id. at 882-84. Among other things, the court applied the exclusionary principles of F.R.E. 403, which authorize the court to disallow relevant evidence if its claimed probative value is substantially outweighed by the risks of unfair prejudice, juror confusion, or other countervailing concerns that may taint the truth-finding process. Id. at 883. Cf. N.J.R.E. 403 (the synonymous New Jersey version of F.R.E. 403).

The majority in Nichols observed that the defense expert had opined on a credibility question "at the heart of the jury's task[,]" specifically the issue of whether the plaintiff could be believed. Id. at 883. "Opinions of this type," noted the

court, "create a serious danger of confusing or misleading the jury." Ibid. (citing F.R.E. 403). The testimony about malingering and the like had the improper capacity to cause the jury "to substitute the expert's credibility assessment for its own common sense determination." Ibid.

As the Nichols majority rightly noted, "[w]eighing evidence and determining credibility are tasks exclusive to the jury, and an expert should not offer an opinion about the truthfulness of witness testimony." Ibid. (internal citations omitted). "Because '[e]xpert evidence can be both powerful and quite misleading,' a trial court must take special care to weigh the risk of unfair prejudice under the probative value of the evidence under [Evidence Rule] 403." Id. at 884 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469, 484 (1993)). Although the defense psychiatrist was presented solely as a witness on damages, the Nichols majority recognized that the expert testimony was likely to also affect the jury's assessment of liability. That was because the case as a whole "turned on whose story the jury would believe — that of [the plaintiff] or that of her supervisors[.]" Ibid.[7]

---

[7] The dissenting judge on the panel in Nichols found no reversible error because, in his view, plaintiff's own medical
(continued)

Several courts around the country have since applied these principles from <u>Nichols</u> barring or restricting expert opinions on malingering, symptom magnification, and similar concepts in jury cases. <u>See, e.g.</u>, <u>United States v. Benedict</u>, 815 <u>F.</u>3d 377, 382 (8th Cir. 2016); <u>Hale County A&M Transp., LLC v. City of Kansas City</u>, 998 <u>F. Supp.</u> 2d 838, 845 (W.D. Mo. 2014); <u>Olson v. Ford Motor Co.</u>, 411 <u>F. Supp.</u> 2d 1137, 1153 (D.N.D. 2006); <u>Figueroa v. Simplicity Plan de P.R.</u>, 267 <u>F. Supp.</u> 2d 161, 164-67 (D.P.R. 2003); <u>Corrothers v. State</u>, 148 <u>So.</u>3d 278, 327 (Miss. 2014). Several unpublished opinions, which we will not cite here, <u>see</u> Rule 1:36-3, have also favorably applied <u>Nichols</u>. We are unaware of any opinions, published or unpublished, that repudiate <u>Nichols</u>, although judges in a few jury cases, without citing <u>Nichols</u> as contrary authority, have permitted expert opinion about malingering, Waddell's signs, or similar concepts. <u>See, e.g.</u>, <u>Rush v. Jostock</u>, 710 <u>N.W.</u>2d 570, 575 (Minn. Ct. App. 2006); <u>Lambert v. State</u>, 126 <u>P.</u>3d 646, 651-52 (Okla. Crim. App. 2005).

We endorse these principles from <u>Nichols</u>. We agree that, in a jury setting, there is a great danger that an expert

---

(continued)
expert opened up this line of testimony by the defense expert, plaintiff did not preserve the issue for appeal, and any error was harmless. <u>Id.</u> at 891-92 (Loken, J., dissenting).

witness who characterizes a plaintiff as a "malingerer" or a "symptom magnifier," or some other negative term impugning the plaintiff's believability will unfairly infect the trier of fact's assessment of the plaintiff's overall narrative on both liability and injury. Such opinion evidence from a doctor inherently has a clear capacity to deprive a plaintiff of a fair jury trial. <u>R.</u> 2:10-2. Consequently, we hold that such testimony at a civil jury trial should be categorically disallowed under <u>N.J.R.E.</u> 403.[8]

We have considered whether this bright-line principle should be diluted to allow the presentation of expert opinion on the concept of symptom magnification in certain limited and exceptional civil jury cases. Having pondered that possibility, we choose to reject it. There are contexts in which a bright-line principle of law best serves litigants and lawyers, and fosters predictability and uniformity. <u>See, e.g.</u>, <u>State v. Bernhardt</u>, 245 <u>N.J. Super.</u> 210, 216 (App. Div. 1991); <u>Zappala v. Zappala</u>, 222 <u>N.J. Super.</u> 169, 173 (App. Div. 1988); <u>In re Will of Ferree</u>, 369 <u>N.J. Super.</u> 136, 153 n.21 (Ch. Div. 2003). This is such an instance.

---

[8] We impose no equivalent restriction on such testimony from a qualified expert in a non-jury trial, subject to case-specific arguments for exclusion under <u>N.J.R.E.</u> 403. <u>See also</u> <u>Nichols</u>, <u>supra</u>, 154 <u>F.</u>3d at 883 n.6 (distinguishing decisions in non-jury cases).

We discern no necessity to cloud this principle of exclusion with exceptions. Defendants still have a variety of means to attempt to impeach a plaintiff, including through arguments and evidence of bias, inconsistent statements, faulty perception or memory, contradiction, prior criminal convictions, and other methods.[9]

We should make clear that this prohibition on expert opinion testimony about malingering or symptom magnification does not disallow factual testimony by an examining physician, conveying to a jury what the physician saw or heard a patient do in the examination room. For example, if a plaintiff claimed to the doctor that she could not lift her right arm above her head without excruciating pain, the doctor would be free to testify that, to the contrary, the doctor observed the plaintiff raise her arm to reach for her coat on the way out of the examination room. The jury would then have the task of evaluating the

---

[9] For sake of completeness, we observe that even if our laws were construed to allow expert opinion on symptom magnification and related concepts to be presented to a jury to undermine a patient's credibility, the expert retained by Wal-Mart in this case lacked appropriate qualifications to render such opinions. Despite his formidable and unchallenged credentials as a very accomplished, board-certified neurologist, the expert was not a psychiatrist, psychologist, or other mental health specialist. Although he may have possessed sufficient experience and training to assess the veracity of his own patients' subjective complaints in his medical practice, he lacked the qualifications to diagnose somatic disorder, malingering, or other conditions at a level suitable for admission at a jury trial.

significance of those observed facts, without any pejorative labeling or credibility opinions from the defense expert.

Nor does our holding preclude a qualified expert from testifying, without using pejorative classification labels such as "malingering" and "symptom magnification," that a plaintiff's subjective complaints appear to be inconsistent with objective medical test results or findings. See, e.g., DiProspero v. Penn, 183 N.J. 477, 489 (2005) (requiring plaintiffs who are subject to the lawsuit limitation option of N.J.S.A. 39:6A-8(a) to support their claims of injury in auto negligence cases with medical "objective clinical evidence").

We are mindful that here, unlike the scenario in Nichols, the trial court issued a limiting instruction reminding the jurors of their exclusive role in assessing witness credibility. We do not believe such an instruction can sufficiently ameliorate the undue harm of admitting the expert opinion in the first place. As we have recognized, sometimes jury instructions about the misuse of evidence are simply inadequate to effectively blunt the risks of significant prejudice. See, e.g., James v. Ruiz, 440 N.J. Super. 45, 76-77 (App. Div. 2015); State v. Collier, 316 N.J. Super. 181, 197 (App. Div. 1998), aff'd o.b., 162 N.J. 27 (1999).

The error in admitting the defense neurologist's opinions on symptom magnification in this case, over a timely and strenuous objection by plaintiff, was not harmless. Cf. State v. Macon, 57 N.J. 325, 333 (1971). The testimony was extensive and emphatic. Indeed, the expert stressed that he had reached his opinions about plaintiff after a "very complicated process," and that they were reinforced by a "banker's box" of medical records, which he claimed further showed plaintiff's tendency to exaggerate her symptoms.

This case was a pitched battle over whether anything that plaintiff had to say about the accident should be believed at all. Her credibility was key because no eyewitnesses to the accident testified. Although defense counsel did not explicitly refer to the defense neurologist in his summation, he did repeatedly argue that plaintiff was not a believable witness. We lack confidence that the jurors ignored the defense expert's testimony about plaintiff's alleged symptom magnification in considering that advocacy. We do not fault the trial judge in this setting — which arose in the absence of New Jersey precedent directly on point — but nonetheless conclude that reversal is mandated.

For these reasons, plaintiff is entitled to a new trial, at which expert opinion testimony about her malingering, symptom

magnification, somatic disorder, and other similar conditions and traits shall be disallowed.

> **[At the discretion of the court, the published version of this opinion omits Part III, which addresses issues unrelated to the symptom magnification issue.  See R. 1:36-2.]**

Reversed and remanded for a new trial consistent with the evidentiary restrictions set forth in this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4137-14T3