NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2120-15T3

JUAN MORALES-HURTADO,

      Plaintiff-Appellant,

v.

ABEL V. REINOSO and NEW
SERVICE, INC.,

      Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

December 6, 2018

APPELLATE DIVISION

Submitted December 13, 2017 – Decided December 6, 2018

Before Judges Alvarez, Nugent and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1450-13.

Jae Lee Law, PC, attorneys for appellant (Martin S. Cedzidlo, on the brief).

Gallo Vitucci & Klar LLP, attorneys for respondents (Eric J. Plantier and Kenneth S. Merber, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

This is a vehicular negligence action.  Plaintiff, Juan Morales-Hurtado,

appeals from an order of judgment entered on a jury's verdict.  The jury found

defendant, Abel V. Reinoso, eighty percent negligent and plaintiff twenty percent negligent for causing the rear-end collision.[1]  The jury awarded plaintiff $50,000 for pain and suffering, impairment, disability, and loss of enjoyment of life.  The jury also awarded plaintiff $71,615.73 for past medical expenses.

Plaintiff contends that defense counsel's prejudicial conduct, the court's denial of a motion for a directed verdict on liability, and the court's decision to bar a life care expert's testimony deprived him of a fair trial.  We agree the cumulative effect of many errors tainted the verdict.  We thus reverse and remand for a new trial.

## I.

## A.

Plaintiff filed a complaint in February 2013, in which he sought compensation for injuries he claimed to have sustained in an August 24, 2011 automobile accident.  Defendant filed an answer and asserted affirmative defenses, including plaintiff's comparative negligence.  The parties completed discovery, argued numerous in limine motions, and tried the case during non-consecutive days in December 2015 and January 2016.  On January 7, 2016,

---

[1] For ease of reference, we refer to Abel V. Reinoso as "defendant."

the jury returned its verdict. The following day, after molding the verdict, the trial court entered an order of judgment. This appeal followed.

B.

Defendant did not dispute at trial that he was partially responsible for causing the accident. The parties disputed whether plaintiff was liable and, if so, to what extent. According to the trial testimony and documentary evidence, the sun was still shining and the intersection of Lemoine Avenue and Bridge Plaza South in Fort Lee was dry on the evening the accident occurred. The right front corner of the jitney — or minibus — defendant was driving struck the left, driver's side rear corner of the 2003 Honda Civic plaintiff was driving.

Plaintiff testified that Lemoine Avenue has two lanes in each direction. He was driving on Lemoine Avenue toward its intersection with Bridge Plaza South, where he intended to make a right turn on his way to the job where he and his passengers worked. According to plaintiff, he passed the bus a short distance before the intersection. He activated his right turn signal and began to turn through the green traffic light onto Bridge Plaza South but had to stop for pedestrians crossing Bridge Plaza South. Glancing into his rear view mirror, plaintiff saw the bus "was still stopped and a passenger was getting on it." The bus was approximately "three to four cars distance." Plaintiff looked back

3

toward the pedestrians. Seconds later, he felt the impact as the bus struck the rear of his car.

Defense counsel began his cross-examination by asking plaintiff his birthdate. He then questioned him about his native country, his citizenship, and his ability to speak English, interjecting a declaratory statement as he did so:

> [Defense Counsel]: Sir, you were born in Columbia?
>
> [Answer]: Correct.
>
> [Defense Counsel]: And you came to the United States in approximately 2002. Is that correct?
>
> [Answer]: Correct.
>
> [Defense Counsel]: Are you a United States citizen?
>
> [Answer]: Correct.
>
> [Defense Counsel]: Have you been living in the United States continuously since 2002 when you came here?
>
> [Answer]: Correct.
>
> [Defense Counsel]: Ok. I am not questioning your right as a citizen or as a witness to use an interpreter but I would just like to ask you briefly about your ability to understand English. Okay sir? You do understand English, right, sir?
>
> [Answer]: A little.

A-2120-15T3

[Defense Counsel]: Okay. And after you came to the United States what – what – I'm sorry, withdrawn. What age were you when you came to the United States?

[Answer]: [Nineteen] years old.

[Defense Counsel]: And you took classes in English when you – after coming to the United States?

[Answer]: Correct.

[Defense Counsel]: And throughout the trial you've been communicating with your attorney in English, including yesterday while I was doing my opening statement, correct?

[Answer]: Correct.

[Defense Counsel]: I just – I'm trying to understand do you understand the statements that are being said in this courtroom before they are translated for you?

[Answer]: A little.

[Defense Counsel]: Let's talk about the accident. . . .

In addition to posing other questions about the accident, defense counsel brought out that the airbags in plaintiff's car did not deploy upon impact.

Defendant's trial version of the accident differed from his interrogatory answers, the police report, and from plaintiff's version of the accident. He testified plaintiff's Honda was the first car stopped for a red light in the outside lane of Lemoine Avenue at its intersection with Bridge Plaza South. Defendant stopped his twenty-five passenger bus behind plaintiff's Honda.

According to defendant, when the light changed to green, plaintiff's Honda turned right, but then suddenly stopped. Defendant "didn't have time to stop." Defendant added that while stopped for the red light behind the Honda, the Honda did not have a turn signal on. Defendant "tried to turn left a little" when the Honda stopped suddenly, but could not do so because the Civic had "stopped immediately." Defendant saw the Honda's brake lights come on and applied his brakes but was unable to avoid the collision. He exited the bus and briefly spoke to plaintiff, who said he had stopped suddenly because there were people crossing the street.

Although defendant testified at trial he had intended to go straight through the intersection, the police report included a diagram showing defendant turning the bus to the right. In addition, in response to an interrogatory asking defendant to describe how the accident occurred, defendant responded: "I was in the process of making a turn and there was a vehicle ahead. The vehicle ahead stopped suddenly without warning and there was contact between our two vehicles." Defendant explained that he misunderstood the question the officer at the scene asked him and perhaps he was misunderstood as well when he answered interrogatories.

During cross-examination, plaintiff's counsel brought out the inconsistencies. When he attempted to cross-examine defendant about his

deposition testimony, defense counsel objected. The following exchange occurred.

> [Plaintiff's Counsel]: Okay. You were asked by an attorney from my office to say, tell me how the accident happens, tell me what happened. And at no point did you ever say, I was planning on going straight, did you?
>
> [Defense Counsel]: Your Honor, I'm objecting because the question is misleading. If he was never asked the question, he didn't give the answer because he was asked the question. It's misleading to tell the jury that he said something or he didn't.
>
> [Plaintiff's Counsel]: Judge, the answers to interrogatories say, tell us your version of the accident. He gave one version. At a deposition we said, tell us your version of the accident. And he doesn't contradict his answers to interrogatories.
>
> [Defense Counsel]: Read him something that's inconsistent with what he's testified to. Confront him with the question where he's asked that question.
>
> [The Court]: . . . overruled.

During his examination of defendant and plaintiff, defense counsel asked questions that were irrelevant to the liability and damage issues. The court ruled that defense counsel could not inquire about whether the other passengers in plaintiff's car were injured in the accident. Nonetheless, defense counsel brought out on cross-examination of plaintiff that two of his passengers were sixty years old. He proffered doing so to show that the

passengers were at the accident scene and "to the extent [one] communicated what happened to the cop." Yet, the last question he asked defendant on direct examination was "Did any of the occupants, other than [plaintiff], sue you?" The court immediately struck the question and instructed the jury it was irrelevant to any liability issue.

## C.

The parties disputed whether the bulging and herniated discs in plaintiff's cervical, thoracic, and lumbar spine were caused by or predated the August 2011 accident. They also disputed the extent of his injuries. Experts expressed differing opinions about October 2011 medical resonance imaging studies (MRIs) of plaintiff's cervical and lumbar spine, a February 2012 MRI of his thoracic spine, and a May 2012 post-discogram lumbar MRI.

Plaintiff testified he experienced pain in his back and legs following the accident. He was taken to a hospital emergency room where he was treated and released. He then came under the care of a chiropractor, who treated him conservatively with electrostimulation modalities and acupuncture. When plaintiff did not improve with the conservative treatment, his chiropractor referred him to Dr. Gregory J. Lawler, a board certified anesthesiologist and pain management physician.

Plaintiff's primary complaint to Dr. Lawler was low back pain, with some pain in his legs and some left and right leg weakness. Dr. Lawler testified the October 2011 and February 2012 MRI studies showed disc herniations in plaintiff's cervical spine at C5-C6, thoracic spine at T7-T8 and T8-T9, and lumbar spine at L4-L5 and L5-S1. The doctor also noted some "slight slippage of the vertebral bodies at L5-S1," called spondylosis.

The doctor analogized vertebral discs to a jelly doughnut, "where . . . fibers . . . encircle the cushioning in the middle." The discs "provide cushioning in an area [so] . . . the bones don't crush into each other and [wear] down." Dr. Lawler explained that the middle portion of the disc – which people often refer to as the "jelly" – has "chemical mediators." When a disc herniates, "those mediators leak out from the disc [and] cause inflammation." The mediator, or chemical substance, can cause a patient to develop a chemical neuritis with corresponding pain.

Dr. Lawler treated plaintiff by having him undergo several epidural injections — the injection of steroids to decrease inflammation — and by prescribing muscle relaxants. The doctor also had plaintiff continue with chiropractic care. When plaintiff's pain did not resolve, the doctor had him undergo a discogram — the insertion of needles into the vertebral discs to locate pain and to introduce contrast material for an MRI study. The

discogram and post-discogram lumbar MRI confirmed plaintiff's disc herniation at L4-L5.

The doctor referred plaintiff to a "board certified orthopedic and fellowship trained spine physician," Dr. Louis Quartararo, for a consultation. When plaintiff's condition had not resolved by August 2012, a year after the accident, Dr. Lawler referred him to a neurosurgeon, Dr. Mark Arginteanu, who eventually operated on plaintiff's low back.

Dr. Lawler testified plaintiff had a herniated disc in his cervical spine at C5-C6, a bulging and a herniated disc in his thoracic spine, the latter at T8-T9, and two herniated discs in his lumbar spine at L4-L5 and L5-S1. He also testified the herniations were caused by the accident and constituted permanent injuries. The doctor's prognosis for plaintiff was poor, especially considering plaintiff was only twenty-eight years old and had "hardware" in his lower back as a consequence of surgery.

When Dr. Lawler came to court, he brought his file with him. The file contained a copy of a draft narrative report he had sent to plaintiff's counsel. The report included the notation, "draft for attorney review." Based on that notation, defense counsel cross-examined the doctor about whether it was his custom and practice while treating patients to write reports to the patients' lawyers for their approval of what the doctor was recommending.

10

Dr. Marc Arginteanu, a board certified neurosurgeon, performed a surgical procedure called a "decompression fusion instrumentation" on plaintiff's low back.[2] Dr. Arginteanu removed from plaintiff's spine the portion of the bone that was pressing on the nerves in the low back. The doctor also removed the disc fragments pressing on the nerves. To stabilize and fuse the bones in the area where the disc material was removed, the doctor inserted a "cage device." The cage device was filled with bone taken from the posterior region and implanted into the disc space. The doctor fastened everything together "with screws and rods," placing two screws in L4, two in L5, and two in S1.

Following the February 2013 surgery, plaintiff returned to Dr. Arginteanu periodically through 2015. The surgery had improved plaintiff's condition, but not to the level of his pre-accident status. Dr. Arginteanu opined that plaintiff's spondylolisthesis existed before the accident but was asymptomatic and aggravated by the injury sustained in the accident. Dr. Arginteanu also opined plaintiff's herniated discs were caused by the injuries from the accident. The doctor's prognosis for plaintiff's complete recovery

---

[2] Dr. Arginteanu's testimony was presented to the jury by way of a video recording.

A-2120-15T3

was poor. In the doctor's opinion, plaintiff would continue to suffer "with at least some element of pain for the remainder of [his] life."

During cross-examination of the doctor, defense counsel inquired about the concept of secondary gain:

> [Defense Counsel]: Are you familiar with the medical concept of secondary gain?
>
> . . . .
>
> [Doctor]: Yes. Secondary gain is when a patient has a reason to have symptoms beyond organic reasons, beyond reasons that you could explain with the pathology you have discovered.
>
> [Defense Counsel]: Okay. And you are familiar with the concept of secondary gain as it might relate to patients who are involved in litigation in which they're seeking monetary compensation for injuries they claimed they suffered, correct?
>
> [Doctor]: Yes.
>
> [Defense Counsel]: And the concept of secondary gain is one that is generally understood and accepted in the medical profession, correct?
>
> [Doctor]: Yes.
>
> [Defense Counsel]: So a doctor such as yourself understands that a patient such as [plaintiff] might have a motive to make complaints because he feels that those complaints might result in his receipt of monetary compensation. Is that correct?
>
> [Doctor]: Yes.

Neither Dr. Arginteanu nor any other doctor testified that plaintiff was exhibiting secondary gain.

Dr. Arginteanu noted in his records that on August 12, 2013, plaintiff's lumbar spine was "under control." Following a December 2013 accident, his spine was out of control. Thereafter, plaintiff's pain began radiating down his left lower extremity with persistent pain, numbness, and weakness. During defense counsel's cross-examination of Dr. Arginteanu on these points, the following exchange occurred:

> Q.    Did you – withdrawn. Well, you knew that Mr. Morales was a plaintiff in a lawsuit at the time that you treated him, right?
>
> A.    No. Not at the time when I first saw him, he was a patient.
>
> Q.    At the time that you formulated your opinion on causation at plaintiff's attorney's request you understood that he was claimant in a lawsuit, right?
>
> A.    Yes.
>
> . . . .
>
> Q.    I'm asking you questions and you're supposed to be here to answer questions. Objectively we had a whole dispute about being objective versus - -
>
> A.    Yes.
>
> Q.    - subjective. If you're not here to advocate for Mr. Morales, you'll just answer my questions and answer whatever they happened to be. And if Mr.

> Morales' lawyer who's actually paid to be his advocate wants to ask questions he'll do so. And it's not your job, in my opinion, the jury will make their own assessment, for you to try to just volunteer information or ask other questions. Will you agree with that? That's not what you're supposed to be doing.
>
> A.    I don't understand the whole lawyer thing, but me being – as I try to be – an honest person I can't sit by when you read half a note and then don't read the end of it.

Plaintiff presented the testimony of two other medical witnesses, Duncan B. Carpenter, a neurosurgeon, and John Michael Athas, a board certified neuroradiologist. Dr. Carpenter had examined plaintiff for the defense, a fact the court barred plaintiff from eliciting during the doctor's examination.[3] Dr. Carpenter opined that the condition of plaintiff's low back, which necessitated the surgery, was caused by the vehicular accident involving defendant. Dr. Carpenter also testified plaintiff's post-surgical low back condition was permanent.

Dr. Athas confirmed the October 2011 MRIs showed bilateral spondylolysis at L5/S1, as well as a disc herniation at L4/L5. The cervical

---

[3]  During a discussion about whether a defense attorney had telephoned Dr. Carpenter's office and asked if he was really going to testify for plaintiff, defense counsel represented that the doctor had been retained by the defense and the defense had never "disavowed him," though they had made a strategic decision not to present his testimony.

MRI revealed a disc herniation at C5/6. Lastly, the February 2012 thoracic MRI disclosed herniations at T8/9 and T9/10, and disc bulges at T6/7 and T7/8. The post-discogram MRI also showed the herniations that had been disclosed on the October 29, 2011 lumbar MRI.

Defendant presented the testimony of two doctors. Dr. Jeffrey Lang, a board certified radiologist, had interpreted flexion-extension x-rays of plaintiff's lumbar spine on June 26, 2012.[4] Dr. Lang interpreted the films as showing a "bilateral spondylolysis with grade one spondylolisthesis at L5." He explained that the spondylolysis is a type of fracture through part of the vertebrae and a spondylolisthesis "is when one vertebrae slips anterior or posterior."

Dr. Lang also interpreted an MRI of plaintiff's lumbar spine on January 29, 2014. Dr. Arginteanu ordered the study. Dr. Lang interpreted the MRI as showing a "[n]ormal postoperative MRI of the lumbosacral spine."

Dr. Robert Traflet, a board certified diagnostic radiologist, interpreted the cervical, thoracic, and lumbar MRIs at defendant's request. Notwithstanding plaintiff's age — twenty-eight at the time of the report — Dr. Traflet opined that the changes throughout plaintiff's cervical, thoracic, and lumbar spine were all degenerative. Dr. Traflet explained why, in his opinion,

_____

[4] Dr. Lang's testimony was presented by way of a videotape.

the MRI studies revealed a chronic, longstanding process, resulting in plaintiff's bulging and herniated discs. This was particularly so, according to the doctor, because "every part [of the spine] didn't just have one abnormality, it had multiple abnormalities."

Dr. Traflet noted that if a person added the abnormalities throughout plaintiff's spine, there would be approximately fourteen abnormal levels. This was significant "because if you were going to postulate a traumatic disc herniation, which can happen, that means that whatever the trauma is has to direct all of the force on that disc." Dr. Traflet explained that discs do not herniate easily, "so if you have multiple things going on and multiple abnormalities over and over and over again it just further supports the degenerative nature" of the condition. Dr. Traflet concluded the herniations and bulges in plaintiff's spine were caused by a degenerative process and were not related to the accident involving defendant.

Defendant also played video surveillance of plaintiff to the jury. His attorney had mentioned the surveillance in his opening statement in the context of a litigious society.

The jury returned a unanimous verdict on liability, finding defendant 80% responsible for the accident and plaintiff 20% responsible. The jury awarded $50,000 to plaintiff for pain, suffering, disability, impairment and

loss of enjoyment of life by a vote of seven to one. The jury unanimously awarded plaintiff $71,615.73 for past medical expenses.

## II.

Plaintiff argues the court erred by permitting defense counsel to interject the concept of "secondary gain" through his cross-examination of a medical witness, even though none of the experts said plaintiff was experiencing secondary gain. Plaintiff also contends defense counsel's conduct, including his personal attacks on witnesses and plaintiff's counsel, warrant a new trial. He contends the court improperly denied his motion for a directed verdict on liability and improperly granted defendant's motion to bar plaintiff's expert's opinion concerning a life care plan.

Defense counsel responds that the questions about which plaintiff complains constitute nothing more than aggressive cross-examination and valid impeachment. He asserts the court did not err either by denying plaintiff's motion for a directed verdict or by barring the testimony of plaintiff's life care expert.

## III.

### A.

We begin our analysis by reiterating that in our system of justice, cross-examination is "the greatest legal engine ever invented for the discovery of

17

truth." California v. Green, 399 U.S. 149, 158 (1970) (quoting 5 Wigmore on Evidence, §1367 (1940); see also State v. Cope, 224 N.J. 530, 555 (2016)). Nonetheless, neither cross-examination nor zealous advocacy is unbounded. Generally, in trial, a lawyer shall not

> allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.
>
> Rule of Professional Conduct 3.4(e); see also Matter of Vincenti, 152 N.J. 253 (1998).[5]

Fundamental principles also circumscribe the conduct of trials. Attorneys address juries in opening and closing statements. R. 1:7-1(a) and (b). Direct and cross-examination of witnesses generally proceed by way of interrogation, that is, questioning. See N.J.R.E. 611(a). It is improper for an attorney to interject personal assertions or opinions while interrogating witnesses. It is also improper for attorneys to make arguments in front of the jury in the guise of objections, a practice often referred to as "speaking" objections.

---

[5] Our opinion should not be read to imply any finding on our part that either attorney deliberately violated the Rules of Professional Conduct.

The court, not the attorneys, is empowered to "exercise reasonable control over the mode and order of interrogating witnesses." Ibid. For this reason, it is improper for an attorney, under the guise of objecting or otherwise, to tell an adversary how to ask a question or to direct arguments and assertions to an adversary rather than to the court. And once the court has ruled on an objection, "counsel must abide by [the court's] ruling, saving objections for appeal." Greenberg v. Stanley, 51 N.J. Super. 90, 102 (App. Div. 1958), aff'd in part, rev'd in part, 30 N.J. 485 (1959).

Credibility determinations are to be made by the jury. "The courts of this State have long adhered to the cardinal principle that '[i]t is within the sole and exclusive province of the jury to determine the credibility of the testimony of a witness.'" Rodriguez v. Wal-Mart Stores, 449 N.J. Super. 577, 590 (App. Div. 2017) (quoting State v. Vandeweaghe, 351 N.J. Super. 467, 481 (App. Div. 2002), aff'd, 177 N.J. 229 (2003)), certif. granted, 230 N.J. 584 (2017). "[T]he jury is charged with making credibility determinations based on ordinary experiences of life and common knowledge about human nature, as well as upon observations of the demeanor and character of the witness." Ibid. (citing State v. Jamerson, 153 N.J. 318, 341 (1998)). For these reasons, courts "do not allow one witness to comment upon the veracity of another witness." Vandeweaghe, 351 N.J. Super. at 481-82. "This prohibition applies even if the

A-2120-15T3

witness proffered to render such a credibility opinion is an expert." Rodriguez, 449 N.J. Super. at 591.

An innocuous violation of any of these principles does not necessarily require a new trial. Taken together, however, numerous small errors can accumulate so as to deprive a party of a fair trial. Torres v. Pabon, 225 N.J. 167, 191 (2016); accord, Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 53 (2009) ("we have recognized that the cumulative effect of small errors may be so great as to work prejudice, and we have not hesitated to afford the party suffering that prejudice relief where it has been warranted"). We conclude this is such a case.

Defense counsel correctly points out that plaintiff did not object in many of these instances. That is so. In fact, plaintiff has not raised many of the issues on this appeal. Nonetheless, an "appellate court may, in the interest of justice, notice plain error not brought to the attention of the trial or appellate court." R. 2:10-2.

With these principles in mind, we turn to the trial.

B.

We first address defendant's opening statement. During his opening statement, defense counsel told the jury: "[a]s one might expect, not surprising in our litigious society, defendant, I - - we made arrangements to have an

investigator look for the plaintiff to see what's he doing in his private life. He's claiming that he's injured. And you'll see, it is not a lot of tape, he's doing what normal people do. . . . "

The statement was improper.

> An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. . . . [I]t is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict.
>
> [United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring).]

Counsel's reference to one's expectations in a litigious society was improper. The remark was not a statement of evidence, and it arguably was an appeal to prejudice.

### C.

Several improprieties occurred during defense counsel's cross-examination of plaintiff and his witnesses. Defense counsel cross-examined plaintiff about when plaintiff came to the United States, his citizenship, whether he had been in the United States continually since his arrival, and plaintiff's need for an interpreter. During the cross-examination, counsel

explained he was not "questioning [plaintiff's] right as a citizen or as a witness to use an interpreter but I would just like to ask you briefly about your ability to understand English." In State v. Sanchez-Medina, the Supreme Court noted that "today . . . evidence of a defendant's undocumented immigration status could appeal to prejudice, inflame certain jurors, and distract them from their proper role in the justice system: to evaluate relevant evidence fairly and objectively." 231 N.J. 452, 463 (2018). Those same considerations apply to questions about a party or witness's citizenship, length of time in United States, and need for an interpreter. True, plaintiff's attorney elicited that plaintiff was born in another country. That did not, however, open the door to questions about plaintiff's citizenship and his need for an interpreter, questions that some might suggest have racial undercurrents. Besides, the court, not a party's adversary, is charged with the responsibility of providing an interpreter when necessary. And an attorney's view about a party's "right as a citizen or as a witness to have an interpreter" is irrelevant.

Even if the latter considerations were relevant – a proposition difficult to discern – their probative value was substantially outweighed by the risk of undue prejudice. See Serrano v. Underground Utils. Corp., 407 N.J. Super. 253, 281 (App. Div. 2009). If defense counsel intends to pose such questions on retrial, he should first make an appropriate proffer to the trial court.

However, "[a] generalized invocation of witness 'credibility' issues will not suffice." Ibid.

Also irrelevant was defense counsel's cross-examination of plaintiff about the age of the passengers in his car. Although defense counsel proffered he was asking about the passengers' ages merely to show they were present at the accident scene, one is hard pressed to comprehend how their ages established their presence. Moreover, defense counsel's question to his own client, "did any of the occupants, other than [plaintiff], sue you," undermines his proffer about the occupants' ages. Although the court immediately struck counsel's question about whether other occupants sued plaintiff, the question must be considered in the context of the totality of inappropriate comments and questions throughout the trial. "As we have recognized, sometimes jury instructions about the misuse of evidence are simply inadequate to effectively blunt the risks of significant prejudice." Rodriguez, 449 N.J. Super. at 598 (citing James v. Ruiz, 440 N.J. Super. 45, 76-77 (App. Div. 2015)).[6]

---

[6]  Defense counsel also asked plaintiff a question about a comment plaintiff's attorney made in his opening statement. Cross-examining a party about his attorney's opening statement is improper. See State v. Woods, 687 P.2d 1201, 1208-09 (Ariz. 1984). As a court instructs the jury in virtually every case, the attorneys' statements are not evidence. See Model Jury Charges (Civil), 1.11, "Preliminary Charge" (Approved Nov. 1998, Revised May 2007).

Defense counsel also cross-examined plaintiff about the airbags in plaintiff's car not deploying upon impact with defendant's bus. In <u>Taing v. Braisted</u>, ____ N.J. Super. ____ (Law Div. 2017), the trial court held that such evidence was inadmissible absent expert testimony. We agree. Moreover, in the case before us, the evidence might have been misleading. There is no evidence airbags are engineered to deploy in rear-end accidents. <u>See, e.g.</u>, <u>Air Bags Quick Facts</u>, SaferCar.gov powered by National Highway Traffic Safety Administration,

https://www.safercar.gov/Vehicle%20Shoppers/Air%20Bags/Quick%20Facts

(last visited Nov 21, 2018). Evidence concerning airbags deploying or not deploying is inadmissible in the absence of expert testimony. Accordingly, such evidence should be excluded when this case is retried.

### D.

Plaintiff contends defense counsel's cross-examination of Dr. Lawler and of Dr. Arginteanu was improper and unduly prejudicial. Cross-examination about the doctors' relationship with plaintiff's law firm was not improper. The doctors' relationship with the law firm, the number of times they have testified at the firm's request, and the basis of their remuneration arguably demonstrate bias.

Similarly, establishing a doctor knew plaintiff was involved in a lawsuit when the doctor wrote a report for plaintiff's counsel was not improper. Granted, the implication of bias from such a fact alone is, to some extent, artificial. The requirement of an expert report is legal, not medical. Discovery rules require lawyers to serve expert reports. So it is arguably artificial to impeach a doctor's credibility based on a legal requirement. Nonetheless, such cross-examination is not inappropriate. Plaintiff may, however, move to exclude the evidence on the ground that in view of the legal requirement its probative value is substantially outweighed by the risk of undue prejudice or by the other factors enumerated in N.J.R.E. 403. The trial court can exercise its broad discretion to admit or exclude the evidence or perhaps explain the discovery requirement to the jury.

In addition, in this case, if such cross-examination is permitted, the trial court should reconsider its decision to preclude plaintiff from bringing out that Dr. Carpenter examined plaintiff on behalf of defendant. After all, Dr. Carpenter presumably understood he was examining plaintiff to render an opinion in a legal action. Such knowledge, and the similarity between his opinions and those of plaintiff's treating physicians, become increasingly relevant in view of defendant's attacks on the credibility of plaintiff's medical experts. Dr. Carpenter's knowledge of the litigation and opinions arguably

refute defendant's suggestion that plaintiff's treating physicians embellished their opinions because they either knew plaintiff was involved in litigation or had previously worked with plaintiff's lawyers.

Defense counsel's cross-examination of Dr. Lawler about his draft report should be barred on retrial. Rule 4:10-2(d)(1) precludes discovery of communications between an attorney and experts concerning the collaborative process during preparation of reports. We can discern no reason why the rule's policy underpinnings would not bar cross-examination concerning the collaborative process when a draft report is inadvertently discovered. Of course, the rule has an exception. If defense counsel contends the exception applies, he can seek leave of court to pursue an appropriate line of cross-examination.

The following assertions defense counsel made while cross-examining Dr. Arginteanu should be disallowed on retrial:

> Q.    I'm asking you questions and you're supposed to be here to answer questions. Objectively we had a whole dispute about being objective versus - -
>
> A.    Yes.
>
> Q.    - subjective. If you're not here to advocate for Mr. Morales, you'll just answer my question and answer whatever they happened to be. And if Mr. Morales' lawyer who's actually paid to be his advocate wants to ask questions he'll do so. And it's not your job, in my opinion, the jury will make their own

26

assessment, for you to try to just volunteer information or ask other questions. Will you agree with that? That's not what you're supported to be doing.

These purported questions were assertions, not questions or interrogation. See N.J.R.E. 611. More significantly, they were not-so-veiled opinions by defense counsel that the doctor was being an advocate, not an objective expert, and was therefore not credible. And they usurped the function of the trial court by commenting on how the doctor should answer questions and suggesting how the jury should assess the doctor's testimony. Ibid.; see also RPC 3.4(e).

We also conclude the trial court erred by denying plaintiff's in limine motion and permitting defendant to cross-examine Dr. Arginteanu about the concept of secondary gain. In Rodriguez, we explained that "in a jury setting, there is a great danger that an expert witness who characterizes a plaintiff as a 'malingerer' or a 'symptom magnifier,' or some other negative term impugning the plaintiff's believability will unfairly infect the trier of fact's assessment of the plaintiff's overall narrative on both liability and injury." Rodriguez, 449 N.J. Super. at 596. We explained that "[s]uch opinion evidence from a doctor inherently has a clear capacity to deprive a plaintiff of a fair jury trial." Ibid. (quoting R. 2:10-2). We thus held "that such testimony at a civil jury trial should be categorically disallowed under N.J.R.E. 403." Ibid.

27

We discern no difference between eliciting a medical opinion that a plaintiff has secondary gain "as it might relate to patients who are involved in litigation in which they're seeking monetary compensation for injuries they claimed they suffered," and interjecting the issue into a trial when it has no support in any documentary evidence or any medical testimony. The latter instance may be even more egregious, because it suggests there is a medical basis for an attack on plaintiff's credibility, when in fact no medical testimony supports such attack. That is what happened here.

E.

Defense counsel's penchant for making inappropriate comments in front of the jury and usurping the court's trial role was not limited to his cross-examination of plaintiff's witnesses. He engaged in the same conduct during plaintiff's cross-examination of defendant. Defendant's trial testimony that he intended to go straight through the intersection was significant to his comparative negligence defense. The police report suggested defendant was making a right turn, and he expressly said so in a sworn interrogatory answer. He changed his testimony at trial. Plaintiff's counsel attempted to impeach him by pointing out he did not say at his deposition that he intended to proceed through the intersection. Defense counsel objected on the ground that the

question was misleading. When plaintiff attempted to pursue the line of questioning, the following exchange occurred:

> [Defense Counsel]: Your Honor, I'm objecting because the question is misleading. If he was never asked the question, he didn't give the answer because he was asked the question. It's misleading to tell the jury that he said something or he didn't.
>
> [Plaintiff's Counsel]: Judge, the answers to interrogatories say, tell us your version of the accident. He gave one version. At a deposition we said, tell us your version of the accident. And he doesn't contradict his answers to interrogatories.
>
> [Defense Counsel]: Read him something that's inconsistent with what he's testified to. Confront him with the question where he's asked that question.
>
> [The Court]: . . . overruled.

Contrary to defense counsel's assertion, the questions were not misleading. Defendant had sworn in interrogatories that he intended to make a right turn. He did not recant that answer or testify differently at his deposition. Plaintiff's counsel pursued a proper line of questioning to establish defendant did not change his testimony until trial. In fact, if the change in testimony was material to the defense of comparative negligence, defense counsel had an obligation to disclose the anticipated change in testimony. McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 371 (2001); T. L. v. Goldberg, 453 N.J. Super. 539, 556-57 (App. Div. 2018), certif. granted, ____ N.J. ____ (2018).

29

Defendant's argument in front of the jury — in the guise of an objection — and his assertion that plaintiff's attorney was misleading the jury, were improper, as was his demand that plaintiff's counsel read something from the deposition. So-called "speaking objections" are prohibited. If an attorney for some reason cannot concisely state an objection in the language of the relevant evidence rule, he or she should request a sidebar, which the court may, in its discretion, grant or deny. "[C]ounsel must abide by [the court's] ruling, saving [further] objections for appeal." Greenberg, 51 N.J. Super. at 102.

That is not to say defense counsel could not have elicited whatever he considered significant from his client's deposition testimony and countered with an alternative argument. But proper procedure required he do so on re-direct examination and in closing argument, not by blurting out opinions and demands of his adversary in front of the jury.

F.

Plaintiff also argues that defense counsel elicited hearsay medical evidence during his cross-examination of plaintiff's medical experts, and continued his excoriation of plaintiff's doctors and plaintiff's attorney during his summation. Because we are remanding this matter for a new trial, and because plaintiff did not object to many of the comments he challenges on appeal, we will merely reiterate some general principles concerning these

issues so that the court and parties may be guided accordingly when they retry the case.

N.J.R.E. 703 provides that the facts or data upon which an expert bases an opinion "need not be admissible in evidence" if such facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  N.J.R.E. 808 limits the admissibility of expert opinion included in an otherwise admissible hearsay statement.  N.J.R.E. 703 may not be used as "a vehicle for the wholesale [introduction] of otherwise inadmissible evidence."  Vandeweaghe, 351 N.J. Super. at 481 (quoting State v. Farthing, 331 N.J. Super. 58, 79 (App. Div. 2000)).  As we have previously explained,

> the combined impact of Rules 703 and 808 is to limit the ability of a testifying expert to convey to a jury either (1) objective "facts or data" or (2) subjective "opinions" based upon such facts, which have been set forth in a hearsay report issued by a non-testifying expert.  In either instance, the testifying expert may not serve as an improper conduit for substantive declarations (whether they be objective or subjective in nature) by a non-testifying expert source.
>
> [Ruiz, 440 N.J. Super. at 66.]

These principles apply to diagnostic tests, the interpretation of which is relevant to the issues in a case.  Id. at 69.  As a general proposition, a testifying medical expert must possess the credentials to interpret diagnostic

studies, such as MRIs and x-rays, and must have personally reviewed such films before being permitted to testify to their interpretation.  See Agha v. Feiner, 198 N.J. 50, 67 (2009).  A testifying medical expert should generally be precluded from testifying to another doctor's interpretation of diagnostic tests relevant to the issues in the case.

In addition, it is improper to cross-examine experts on details of documents they have not seen or relied upon.  State v. Rose, 112 N.J. 454 (1988); Corcoran v. Sears Roebuck & Co., 312 N.J. Super. 117 (App. Div. 1998); see also, Crispin v. Volkswagonwerk AG, 248 N.J. Super. 540, 551-52 (App. Div. 1991).

As previously noted, it is improper to ask a witness a question requiring that witness to comment upon the veracity of another witness.  Vandeweaghe, 351 N.J. Super. at 481-82.  The prohibition applies to experts as well as lay witnesses.  Rodriguez, 449 N.J. Super. at 591.

Concerning closing arguments, we explained in Rodd v. Raritan Radiologic Assocs., PA, 373 N.J. Super. 154, 171-72 (App. Div. 2004):

> Although attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness, Henker v. Preybylowski, 216 N.J. Super. 513, 518-19 (App. Div. 1987); Geler v. Akawie, 358 N.J. Super. 437, 470-71 (App. Div.), certif. denied, 177 N.J. 223 (2003), or accuse a party's attorney of wanting the jury to

> evaluate the evidence unfairly, of trying to deceive the jury, or of deliberately distorting the evidence.

We trust the parties will adhere to these principles when they retry this case.

## IV.

Plaintiff next contends the court erred by not directing a verdict in favor of plaintiff on liability, negligence, and proximate causation. The issue warrants little discussion. As defendant concedes in his brief, he "never contended that his negligence played no part in the accident. In fact, defense counsel urged the jury to find negligence on the part of the [d]efendant/[r]espondent." The evidence at trial established beyond dispute that defendant was negligent and that his negligence was a proximate cause of the accident. The trial court should have directed a verdict on those issues.

On the other hand, defendant's testimony, if believed, provided a basis for the jury to conclude plaintiff was negligent and his negligence was a proximate cause of the accident. Of course, the jury could have disbelieved defendant's testimony. But in view of defendant's testimony, the issues of whether plaintiff was negligent, whether plaintiff's negligence was a proximate cause of the accident, and whether liability should be apportioned presented questions for the jury to decide. The trial court properly denied a directed verdict on these issues.

33

V.

Finally, plaintiff argues the court erred by barring his life care expert following a lengthy hearing pursuant to N.J.R.E. 104. Significantly, the trial court, in its decision, did not explicitly conclude the life care expert had rendered a net opinion. For the following reasons, we vacate the court's verbal order precluding the testimony and remand for further consideration on retrial.

Plaintiff's life care expert, Dianne C. Simmons-Grab, met with plaintiff and his wife at their home. She reviewed Dr. Lawler's records from Bergen Pain Management as well as records from Paramus Surgical Center and the "Comprehensive Pain Management Therapy Center." She reviewed the records from Metropolitan Neurosurgery, where Dr. Arginteanu practiced, as well as records from Spine Center and Orthopedic Rehabilitation of Englewood, where a Dr. Kim practiced. She also reviewed the medical records of Dr. Ermann, the chiropractor, as well as diagnostic studies. Following her consideration of the medical records, Simmons-Grab followed up with the medical offices, either by talking to staff or sending a questionnaire.

The questionnaires were comprehensive. Simmons-Grab would also send a "summary" letter to a doctor confirming information she received. The doctor would indicate approval by signing the summary. For example, Simmons-Grab prepared the following summary, which Dr. Arginteanu signed:

This writer spoke with Emily, the nurse for Marc S. Arginteanu, M.D., on May 20, 2014 regarding Juan Morales Hurtado and his care that is required pertaining to the accident of August 24, 2011.

- Emily noted that Dr. Arginteanu stated that Mr. Morales Hurtado has currently reached maximum medical improvement regarding his active spine surgery care.
- Mr. Morales will require an orthopedic surgeon evaluation every two years, as well as x-rays of the spine (cervical, thoracic, lumbar) to monitor and evaluate his pain and to assure the stability of the spine and if any other procedures are necessary.
- It is recommended that Mr. Morales Hurtado be evaluated by a pain management specialist to develop a treatment plan to control his pain.
- It is also recommended that Mr. Morales Hurtado be evaluated by a rehabilitation doctor to develop a treatment plan to restore his functional activities and quality of life.
- In the current lumbar fusion that was completed recently, the possibility of some of the hardware requiring removal is under 50%.
- Following are questions that still need to be answered:
    - What is the probability of Mr. Hurtado requiring cervical surgery some time in the future?  10%
    - What is the possibility of a lumbar adjacent segment disorder?  10-15%
    - Should Mr. Hurtado be participating in physical therapy periodically such as zero to 24 times per year to help reduce pain and maintain strength?  Yes.[7]

---

[7] The answers were handwritten on the typewritten letter.

A-2120-15T3

Below the summary appeared a signature which the expert identified as Dr. Arginteanu's.

Although the court found the expert qualified to render an opinion in the field of life care planning, and though the expert testified the medical records and questionnaires she relied upon were of the type reasonably relied upon by experts in the particular field, the court nonetheless precluded her from testifying. In doing so, it appears the court believed that if the underlying data and records were inadmissible, the expert's opinion must be barred. The court also made credibility determinations about the information the expert relied upon — credibility determinations that should have been made by a jury.

The court undertook an analysis of the medical records, questionnaires, and follow-up letters the expert relied upon and determined they were inadmissible under N.J.R.E. 703, N.J.R.E. 808, and Ruiz, 440 N.J. Super. at 45. The court then appeared to conclude that because the underlying information was inadmissible, the expert's opinion must be barred. If this is what the court intended, it reached an incorrect conclusion. Experts are permitted to "apprise the trier of fact of the bases for [their] opinion, including the opinions of other experts," but are not entitled "to introduce an out-of-court expert's report for its 'truth', where it is critical to the primary issue in the case and the adversary objects." Ruiz, 440 N.J. Super. at 65 (quoting Agha, 198

N.J. at 50). Exclusion of the information or data an expert has relied upon does not require exclusion of the expert's opinion.

The court appears to have made the same mistake concerning the expert's interview with plaintiff's wife. The court noted plaintiff's spouse had not been named as a witness and could not testify at trial. Nonetheless, the expert had the right to apprise the jury she relied on, among other things, interviews with plaintiff and his wife. Of course, a trial court should provide "a limiting instruction to the jury in situations where a testifying expert identifies or alludes to the sources upon which he or she has professionally relied. Such an instruction is necessary to assure that the jurors do not improperly consider those outside sources for their truth." Ruiz, 440 N.J. Super. at 70.

Citing N.J.R.E. 808, the trial court determined the information underlying the expert's opinion was not trustworthy, particularly the questionnaires the expert submitted to the doctors and the letters or memoranda the doctors signed. But the court's reasons for such findings were based on facts that may or may not have been disputed, which a jury should have determined. Other reasons were unsupported by precedent concerning expert testimony. For example, though the expert identified the signature of doctors on certain documents, the court questioned how the expert could make

37

such an identification when the signatures appeared to be illegible. Of course, the issue could have been resolved definitively by asking the doctor. But once the expert authenticated the signature, any dispute presented a question for the jury.

The court repeatedly noted the questions posed by the expert to the doctors were "leading." The court also repeatedly stated the questionnaires and letters the expert relied upon were not prepared in the ordinary course of business. And the court pointed out Simmons-Grab was unaware plaintiff had been involved in two subsequent motor vehicle accidents.

The jury was entitled to consider these matters when deciding what weight to give to the expert's testimony. The court, however, cited no authority for the proposition that such considerations were appropriate when considering the admissibility of expert testimony. Nor has defendant. In fact, defendant has cited no case law in support of the arguments in his brief contending the trial court's decision to exclude the life care expert should be upheld.

The court also stressed that the questionnaires and summaries utilized by the expert, even if signed by the doctors, were uncertified, did not express opinions within a reasonable degree of medical certainty, and contained information not contained in the medical experts' narrative reports and records.

The court cited no precedent, nor has defendant, to suggest that underlying medical information relied upon by a life care or other expert must be certified. And at least at the time the expert wrote the report, the parties did not know if the doctor's opinions had been expressed within a reasonable degree of medical probability, because the parties had not deposed the doctors about that issue.

The life care expert's report covered a range of future needs, including surgery, therapy, medication, and periodic evaluations. Even if some of the underlying information was somehow improperly considered by her, such was not a basis for the wholesale exclusion of her entire opinion.[8]

Although we vacate the oral order striking the expert's opinion, we do not reach the conclusion that the opinion is or is not admissible. On remand, defendant may renew his motion to bar the expert. The trial court may exercise its discretion to employ any procedure it deems fit to resolve the motion. Considering a transcript of the life care planner's testimony is now available, the court might consider having the parties brief the issue well in advance of trial. The trial court will then have the time to make detailed findings of fact and conclusions of law supported by appropriate precedent.

---

[8] Plaintiff points out in his appellate brief that defendant submitted the report of a life care expert that was based on less information than that relied upon by plaintiff's expert.

## VI.

We conclude the cumulative effect of multiple errors and improprieties deprived plaintiff of a fair trial and of a verdict based on the merits of the parties' claims. For that reason, plaintiff is entitled to a new trial on all issues.

Reversed and remanded for trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2120-15T3